In re YOUROVETA HOME & FOREIGN TRADE CO., Inc.

(Circuit Court of Appeals, Second Circuit. January 29, 1923.)

No. 111.

1. **Bankruptcy ☞440—Order refusing to vacate or limit order for examination of witness reviewable on petition to revise, not on appeal.**

A ruling affirming the action of the referee in denying a motion to vacate an order for examination of a witness and refusing to limit such examination is an intermediate administrative step in a proceeding in bankruptcy, and reviewable, under Bankruptcy Act, § 24b (Comp. St. § 9608), on a petition to revise, but not on appeal and where both methods of review are invoked the appeal will be dismissed, and the petition to revise considered.

2. **Bankruptcy ☞234—Any "person" may be required to submit to examination concerning acts, conduct, or property of bankrupt, though not citizen or resident of United States.**

Under Bankruptcy Act, § 21a, as amended in 1903 (Comp. St. § 9605), a court of bankruptcy may require any "person," who is within its jurisdiction and can be served, to appear and be examined concerning any acts, conduct, or property of the bankrupt, and such person need not be a citizen or resident of the United States, if, at the time of proper service, he is within the United States, notwithstanding the provision of section 41a (Comp. St. § 9625), that no person shall be required to attend as a witness before a referee at a place outside of the state of his residence and more than 100 miles from such place of residence.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Person.]

3. **Bankruptcy ☞234—Statutes construed together to authorize examination of aliens served within district.**

Bankruptcy Act, § 41a (Comp. St. § 9625), providing that no person shall be required to attend before a referee as a witness at a place outside the state of his residence and more than 100 miles from such

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

place of residence must be construed with Rev. St. § 876 (Comp. St. § 1487) authorizing subpœnas for witnesses in any District Court to run into any other district, provided that in civil causes the witnesses living out of the district in which the court is held do not live at a greater distance than 100 miles from the place of holding same, to mean that a witness having a residence within the United States should not be required to leave his place of residence and proceed outside the state, or more than 100 miles from such residence, to be examined as a witness, and not to preclude the examination of foreign subjects or citizens when properly served within the district.

**4. Bankruptcy ☞236—Examination of persons concerning property of bankrupt may be had any time after filing petition.**

The filing of a petition in bankruptcy operates to place the property of an alleged bankrupt in custodia legis, from which time it is under the control of the court, with a view to its ultimate distribution, among creditors, and any time thereafter an examination, under Bankruptcy Act, § 21a (Comp. St. § 9605), may be had to require any person to disclose his knowledge of any acts, conduct, or property of the bankrupt.

**5. Bankruptcy ☞242(1)—Object of examination of persons other than bankrupt is to ascertain extent and whereabouts of estate.**

The examination of persons other than the bankrupt, authorized by Bankruptcy Act, § 21a (Comp. St. § 9605), is a summary proceeding, to obtain full information as to the bankrupt's property, and to show the condition of the estate, to enable the court to ascertain its extent and whereabouts, and secure possession of it, and such examination may properly extend to any matters which have a tendency to disclose or have a bearing on the bankrupt estate.

**6. Bankruptcy ☞242(1)—Examination of persons other than bankrupt not permitted to go beyond proper limits.**

Although Bankruptcy Act, § 21a (Comp. St. § 9605), is to be liberally construed and the greatest latitude allowed in the examination of the bankrupt, yet it is the duty of the court to restrict such examination to its legitimate object, which is the discovery of assets of the bankrupt, or of grounds of opposition to his discharge, and, particularly in the case of a person other than the bankrupt, his examination should not be permitted to seek by inquisitorial methods to make him disclose whether he has property or means which would make it worth while to pursue him by litigation; such inquiry having no reference to the bankruptcy matter.

**7. Bankruptcy ☞242(1)—Examination of persons other than bankrupt not permitted to go beyond proper limits.**

Where the examination of a person other than the bankrupt disclosed that such person had no knowledge of the bankrupt's acts conduct, or property, and that he had not taken, and did not have in his possession at any time, any of the bankrupt's property it was error to rule that he must on such examination, answer questions, the sole object of which was to compel him to disclose personal property or means that might be reached by his creditors in an action against him.

Petition to Revise Order of and Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the Youroveta Home & Foreign Trade Company, Inc., bankrupt. From an order of the District Judge, confirming orders and rulings of the referee in bankruptcy, refusing to vacate an order for the examination of Gregory Semenoff, and refusing to limit such examination, he appeals and petitions to revise. Reversed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This is an appeal from and a petition to revise an order made by a District Judge on August 24, 1922, confirming certain orders and rulings of a referee in bankruptcy. The bankrupt company was adjudicated a bankrupt by the United States District Court for the Southern District of New York on April 13, 1921, and John N. Boyle, Esq., in due course, was appointed its trustee. The bankrupt company had been engaged in large export and import transactions and at the time of the bankruptcy proceedings possessed substantial assets, not only in the United States, but in foreign countries, and particularly in the Far East. Some time before the bankruptcy a large quantity of English woolens, the cost price of which was estimated to be $475,000, purchased by the bankrupt company in England, was shipped into Siberia, en route to Russia. On account of the disturbed military and political conditions then prevailing throughout all of Russia, these woolens could not be sent to their destination, and were placed in storage at some point in Siberia. Gen. Gregory Semenoff, the appellant, was commander of military forces operating in that region and in the progress of his operations, it is alleged, seized these woolens and confiscated the same making no payment of any character whatever to the bankrupt company. Representations with reference to this seizure were made by the State Department on behalf of the bankrupt company, which was an American concern; but these did not avail to bring about payment for the property seized. Thereafter the trustee in bankruptcy commenced a suit against the appellant in the courts of China, in which country the appellant then resided, for the conversion of this property, and in this suit the trustee attached certain property belonging to the appellant. This suit is still pending.

We understand that there is no denial of any of these facts, except the fact of the seizure of the property in question by the appellant or by troops operating under his command and upon his orders. Sometime during the month of April, 1922, it was announced, through the newspapers, that the appellant was on his way to this country and thereupon the trustee applied to the referee in bankruptcy for an order for the examination of the said appellant under section 21a of the Bankruptcy Act (Comp. St. § 9605) with respect to the acts, conduct, and property of the bankrupt. This application was granted, and an order was made requiring him to appear before the referee and be examined with respect to the acts, conduct, and property of the bankrupt. A subpœna was issued pursuant to that order, and was served upon appellant after his arrival in New York City. The appellant appeared on April 7, 1922, the time designated in the subpœna, before the referee accompanied by counsel. He was duly sworn and by consent his examination was adjourned until the next day. In the meantime other witnesses were examined. On April 8, 1922, he again appeared, accompanied by counsel, and submitted to an examination. The examination was thereupon adjourned by consent until April 10th, at which time the witness appeared again with counsel and submitted to further examination. The matter was then adjourned by consent to April 13, 1922. Again the appellant appeared, this time accompanied by new counsel, who stated that they had been substituted in place of the former attorneys for the appellant, and who made a long statement upon the record with regard to the military activities in which the appellant was engaged at the time of the alleged seizure of the property in question.

Counsel then argued that the status of the appellant at the time he was engaged in these military activities entitled him to immunity against any examination, and an application was thereupon made upon these oral statements to vacate the order for the examination. The referee denied this application and directed the examination to proceed. Thereupon counsel for the trustee propounded a number of questions to the appellant. Objections were made to these questions by the appellant's counsel, but the same were overruled by the referee, who directed the witness to answer. The witness declined to answer upon advice of his counsel. Thereafter the appellant presented formal motion papers to the referee on an application to vacate the order for his examination, or in the alternative to limit the

said examination. This motion was denied by the referee, with a memorandum. Thereupon the appellant filed a petition to review the said order of the referee. The referee duly filed his certificate upon this petition to review, and in due course a hearing upon this certificate came on before one of the District Judges. As already stated, he confirmed the orders and rulings of the referee. The petition to appeal and petition to revise were then filed by the appellant.

It may be mentioned that between the time of the last hearing before the referee, when the appellant declined to answer the questions which had been ruled proper, and the time of the hearing upon the petition to review the referee's order, the appellant, according to newspaper accounts, left the United States and sailed from some Canadian port for some point in the Far East, and that he has not since then been, and is not now, within the jurisdiction of this court. These facts appear in the papers filed in this court in connection with a motion made to dismiss the petition to appeal and petition to revise, and such facts are not denied.

The status of Gen. Semenoff, throughout the period respecting which the trustee asserts the right to question him about his acts, in the main is as follows: In 1917, Gen. Semenoff, while serving with his regiment against the German armies on the Galician front, was recalled to Petrograd by the provisional government, known as the Kerensky government, and directed to proceed to Siberia for the purpose of recruiting military detachments. Gen. Semenoff went to Siberia, but before he was able to complete the organization of such detachments and return to the Russo-German front, the provisional government under Kerensky was overthrown. He thereupon established military headquarters at Manchuria on the Russo-Manchurian border and commenced military operations against the German and Austrian prisoners, who were armed and commanded by Bolshevik agents, and who were attacking the Russian forces. In the fall of 1918, a Siberian provisional government was set up at Omsk, and Gen. Semenoff placed himself and his troops under the direction of that government, and was appointed commander of the Pri-Amur Army Corps. About May, 1919, Admiral Kolchak, who had been appointed by the Siberian provisional government supreme ruler of Russia, appointed Gen. Semenoff commander of the Sixth Army Corps of the Eastern Siberian army. About December, 1919, Admiral Kolchak appointed him commander of the Pri-Amur, Trans-Baikal, and Irkutsk military districts, and in January, 1920, Admiral Kolchak conferred upon him full military and civil power throughout Eastern Siberia.

Clark, Prentice & Roulstone, of New York City (Ezra P. Prentice, Maitland Dwight, and Gullie B. Goldin, all of New York City, of counsel), for petitioner appellant.

David W. Kahn, of New York City (Edward S. Greenbaum, of New York City, of counsel), for respondent.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1] As this proceeding comes into this court upon appeal and petition to revise, and as the two methods are mutually exclusive and not cumulative, and as we think the petition to revise is the appropriate method by which to have this court review the questions which are presented, we dismiss the appeal and entertain the petition to revise. Our jurisdiction rests upon section 24b of the Bankruptcy Act (Comp. St. § 9608). The order appealed from was taken as an intermediate administrative step in a proceeding in bankruptcy.

The petitioner appellant, Gen. Semenoff, is a citizen and resident of Russia, and as he was passing through the United States and through

the state of New York on his way to France, was subpœnaed to appear before a referee in bankruptcy that he might be examined concerning "the acts, conduct and property" of the bankrupt, the Youroveta Home & Foreign Trade Co., Inc. The subpœna was issued upon the petition of the trustee of the bankrupt upon his representation that Semenoff had information concerning the acts, conduct, and property of the bankrupt which would be of benefit to the trustee in the administration of the estate.

The Bankruptcy Act, as amended in 1903, provides in section 21a as follows:

"A court of bankruptcy may, upon application of any officer, bankrupt, or creditor, by order require any designated person, including the bankrupt and his wife, to appear in court or before a referee or the judge of any state court, to be examined concerning the acts, conduct, or property of a bankrupt whose estate is in process of administration under this act. * * *" 32 Stat. p. 798, c. 487.

[2] Under the section quoted a court of bankruptcy may require "any person," who is within its jurisdiction and can be served, to appear and be examined "concerning the acts, conduct, or property" of the bankrupt. The "any person" referred to need not be a citizen of the United States, or even a resident within the United States, if only he is at the time in this country and is properly served. The power to require "any person" to attend and be examined is given generally, and we cannot write into the act exceptions and limitations which it does not contain. It is enough for our present purpose to say that the words "any person" mean what they say, and are not to be restricted to a person who is a citizen of the United States or to an inhabitant of the district in which the bankruptcy proceedings are pending.

[3] The appellant, however, calls our attention to section 41a of the Bankruptcy Act (Comp. St. § 9625), which provides in part as follows:

"Provided, that no person shall be required to attend as a witness before a referee at a place outside of the state of his residence, and more than one hundred miles from such place of residence. * * *"

We understood that the above provision applies only to persons having a residence within the United States, and that it is without application to a witness who has no residence in the United States. The provision quoted from section 41a must be construed in accordance with section 876 of the Revised Statutes (Comp. St. § 1487), which reads as follows:

"Subpœnas for witnesses who are required to attend a court of the United States, in any district, may run into any other district: Provided, that in civil causes the witnesses living out of the district in which the court is held do not live at a greater distance than one hundred miles from the place of holding the same."

A subpœna issued in one district may thus run into another district of the United States. It, of course, cannot run into a foreign state. What was obviously intended was that a witness having a residence within the United States should not be required to leave that place of residence and proceed outside the state of such residence, or more

than 100 miles therefrom, to be examined as a witness. And what is said in In re Hemstreet (D. C.) 117 Fed. 568, 569, and in In re Williams (D. C.) 123 Fed. 321, and in In re Cole (D. C.) 133 Fed. 414, must be understood as applying to persons having a residence within the United States.

In giving the construction we do to section 41 of the act, we call attention to the construction this court gave to the somewhat analogous provision in section 7 of the same act (Comp. St. § 9591). That section, prescribing the duties of a bankrupt, provides that a bankrupt shall not be required to attend a meeting of his creditors at a place more than 150 miles distant from his home or principal place of business. We construed that section in Matter of Havens, 255 Fed. 478, 166 C. C. A. 554. In that case an alleged bankrupt had come within the jurisdiction to contest an involuntary petition in bankruptcy filed against him, and during the progress of the trial the order for his examination was made and served upon him. He contended that under section 7 he could not be required to attend an examination at Buffalo because it was more than 150 miles distant from his home in Missouri. This court, nevertheless, held that, the subpœna having been served upon him within the court's jurisdiction, his nonresidence did not avail him. In holding that the service of the subpœna upon the bankrupt was valid and required his attendance at Buffalo, although it was more than 150 miles distant from his home or principal place of business, we said:

"Assuming that both his person and business homes were most remote from Buffalo, we think the section referred to has no application, because he had already come there."

In section 41, as in section 7, the language used is "required to attend," and it must be manifest that if, under section 7, protecting a bankrupt against examination at a point distant from his place of residence, he may, nevertheless, be served if he voluntarily comes within the jurisdiction, a witness enjoys no greater immunity under section 41 when he comes within the jurisdiction. But whether the District Court could issue a subpœna to a witness who resided outside the state and more than 100 miles from his place of residence, and compel him to appear and testify, is a question which is not before us, as the witness was not brought within the jurisdiction of the subpœna, and appeared and submitted himself to the jurisdiction without protest.

What happened was, as before indicated, that in obedience to a subpœna served on him in New York City he appeared before the referee and was examined at length on April 8, 1922, and on April 10th; his examination covering 39 printed pages of the record. Then on April 26, being represented by different counsel, his counsel objected that the examination should not proceed, "because it is an investigation by our courts into the acts of a military officer acting under the authority of a foreign government," and that for that reason it was not within the power of the plaintiff to subject him to process and bring him into court. Thereupon a motion to vacate the order of examination was made and denied. We do not find it necessary to determine in this case the right to inquire into the acts of a military officer acting under

the authority of a de facto government, and we shall decide this case without reference thereto, interesting as that question is. See Underhill v. Hernandez, 168 U. S. 252, 18 Sup. Ct. 83, 42 L. Ed. 456. We prefer to place our decision upon other grounds.

[4, 5] The filing of a petition in bankruptcy operates to place the property of an alleged bankrupt in custodia legis, and from that time it is under the control of the court with a view to its ultimate distribution among the creditors; and at any time after the petition has been filed an examination under section 21a may be ordered. Cameron v. United States, 231 U. S. 710, 717, 34 Sup. Ct. 244, 58 L. Ed. 448. The object of the examination authorized by that section is to show the condition of the estate, to enable the court to ascertain its extent and whereabouts, and to come into possession of it. The simple object of it is to obtain full information as to the bankrupt's property. It provides a summary method for the discovery of hidden assets. The person to be examined cannot object to the examination on the ground that no issue has been made up for determination. In re Samuels, 215 Fed. 845, 132 C. C. A. 187. Upon such examination no specific issue is or can be made up, and any fact is relevant and material which tends to establish anything which may become important in the administration. As said in Ulmer v. United States, 219 Fed. 641, 134 C. C. A. 127:

"The existence of property rights or interests not scheduled, or rights to defend against apparent claims, or rights of creditors to reclaim property in the hands of the bankrupt, or rights of a bankrupt to discharge— all these are instances of matters properly subject to investigation on such a proceeding."

And we have no doubt that the examination may properly extend to any matters which have a tendency to disclose, or have a bearing upon, the property of the bankrupt estate.

[6] But while section 21a is to be liberally construed, and the greatest latitude should be allowed in the examination of the bankrupt, yet there are limits beyond which the examination cannot be permitted to go. Whether the same liberality of construction applies when it is sought to inquire into the acts, conduct or property of a third person, not a bankrupt or the creditor of the bankrupt, is a different matter. In all cases the inquiry must relate to the "acts, conduct or property of the bankrupt," and it cannot be extended beyond that; and it is the duty of the courts to see that such examinations are confined to the legitimate objects of such an investigation, which is the discovery of assets of the bankrupt, or of grounds of opposition to his discharge. In re Howard (D. C.) 95 Fed. 415, 416, 417; In re Horgan, 98 Fed. 414, 39 C. C. A. 118; In re Carley (D. C.) 106 Fed. 862, 863; In re E. S. Wheeler & Co. (D. C.) 151 Fed. 542; In re Seligman (D. C.) 192 Fed. 750, 751; In re Madero Bros. (D. C.) 256 Fed. 859.

In Black on Bankruptcy, § 269, that writer, in dealing with the scope of the inquiry under section 21a, states that there are limits to the range which the examination may take, and no questions are proper which are not relevant to the matters described in the statute as the subjects of the inquiry. He says:

288 F.—33

"The course of the examination must be confined within legal limits, and though the court is vested with the wide measure of discretion as to its scope, it must not be pushed so far as to encroach upon the witness' right of privacy in relation to his own affairs, where the concerns of the bankrupt are not involved. While the statute should be liberally construed, so as to enforce full and frank answers by a witness in aid of the bankruptcy proceedings, yet it does not authorize an inquiry into his private affairs which have no relation to the 'acts, conduct, or property' of the bankrupt, nor can the court require him to produce private papers having no relation thereto. * * *"

Prior to the examination of Gen. Semenoff, Madame Semenoff, his wife, was examined for the purpose of ascertaining through her as to the property which he possessed. Her testimony was most inquisitorial in character, and it failed to elicit anything which had the remotest connection with the acts, conduct, or property of the bankrupt. The following is a brief excerpt from her testimony:

"Q. How many pieces of luggage did you have?  A. Six pieces.

"Q. How many trunks?  A. No trunks; two boxes, a big box, and a hand bag; with the hand bag there was a box for jewels and a lot of small things; there was no basket. * * *

"Q. Where had you been living before you sailed on that boat?  A. Tientsien.

"Q. What became of the General's other personal belongings?  A. Everything is with us.

"Q. All the General's personal belongings and yours, all the things could be put in these six pieces of luggage; is that correct?  A. Yes; that is all.

"Q. How many servants did you have before you left?  A. None.

"Q. Where had you been living?  A. Rue la France, in the French Concession, No. 13; and we rented one room, because we could not afford an apartment. * * *

"Q. Did you have any money with you when you arrived at Vancouver? A. Yes.

"Q. Approximately how much?  A. $1,352.

"Q. And that is all?  A. That is all.

"Q. Did any one else in your party have any money?  Was there any one else in your party when you arrived in Vancouver?  A. Nobody; I was alone with the General.

"Q. What other personal property did you or the General have, other than wearing apparel?  A. Nothing only wearing apparel, underwear, and clothing.

"Q. What other personal property did you or the General have, other than wearing apparel?  A. Yes; I had some valuables.

"Q. What did those valuables consist of?  A. A necklace I had, and a platinum watch and diamond ear-rings, and that is all.

"Q. What became of the necklace?  A. I gave it yesterday as deposit. I had jewels, and the jewelers came and appraised it and took it.

"Q. What personal property did the General have with him when he came to Vancouver?  A. I said already he had only suits, underwear, and toilet articles.

"Q. How long did you have that necklace?  A. I have it from my mother.

"Q. How long had you had that necklace?  A. When my mother was young, my father was a colonel in the Royal Guard of the czar and gave it to her.  He was in the service and occupied a very high position in the Royal Guards.

"Q. Approximately how much is that necklace worth in your opinion?  A. For me it is double value. * * *

"Q. What other property did General Semenoff have before he left the Far East, within a month before he left?  A. Whatever we have at the present time.

"Q. Didn't he have any money in the bank over there?  A. No; we couldn't even afford to bring the child, which I left with my sister."

There was more of this testimony, equally inquisitional and equally disconnected with anything appertaining to the acts, conduct, or property of the bankrupt. The examination of Madame Semenoff having been concluded, Gen. Semenoff was placed under examination. There is no testimony in the record which shows that he ever had any transactions whatever with the bankrupt, or that he ever knew anything about the acts, conduct or property of the bankrupt. The extent of his knowledge of the bankrupt is shown in the following excerpt from his testimony:

"Q. Did you ever hear of Mr. Atlas, who was the representative of the Youroveta Company at Vladivostok? A. Never heard of him.

"Q. Did you ever hear of the Youroveta Company? A. Yes; I heard of the existence of such a company.

"Q. When was the first time you heard of it? A. In Shanghai.

"Q. Did you hear of the seizure of certain woolen goods belonging to the Youroveta Company? A. No; I have not heard it that they took woolen.

"Q. What goods did you hear about? A. I have not heard of any merchandise they were taking. I just heard about the money, and I just heard about the claim here.

"Q. You heard of them at Shanghai first? A. Yes.

"Q. Did you hear of the seizure of merchandise consisting of woolen goods or furs by soldiers under you before you got here? A. No; I had no such information, outside of generally there were claims against soldiers which were made for requisitioned goods."

He had been engaged in the war against the Bolsheviki from 1918 to 1921, and was commander in chief of all the Siberian forces, deriving his appointment and authority as before stated from Admiral Kolchak. He had under him a chief of the army, a chief of staff, and a general of a corps—all with authority to issue orders independently, and to exercise their authority according to their own judgment. Having been asked as to the number of troops he had under his control, whether his position was a very responsible and important one, whether he realized that responsibility, whether he was able to control his troops, whether the men in his service were doing things generally contrary to his orders, and what kind of things they did without his order, and other matters equally inquisitorial and irrelevant, his attention was called to the subject of requisitions, and he testified that he had nothing whatever to do with requisitions. His testimony upon that point was most positive. He testified as follows:

"Q. Among the things that were required to maintain your military command, were the requisitioning of certain property; is that right? A. No; I didn't have to personally. I had no direct charge of supplying the army with food or clothes.

"Q. The problem of supplying your army with food and money was very difficult, on account of the unsettled condition there; is that right? A. I repeat again I had no charge of that, and there were special officers that took care of supplying the army with food and money, and that was not my problem.

"Q. One of the principal responsibilities of the commander in chief, however, was having these officers under him supply the men with food, clothing, and money, was it not? A. No; it did not concern the supreme commander in chief to see they were properly supplied with food and money. For that purpose there was a quartermaster, who had to take care of all that; there was also a minister of supplies.

"Q. And the minister of supplies and the quartermaster were under your command, were they not? A. No; they were directly in charge of the government of Siberia.

"Q. What was your position there? A. Purely military operations, to direct retreats or advances, to arrange military plans, or approve or disapprove military plans."

## Again he testified:

"Q. Do you mean to say that you personally, through your subordinates, had nothing to do with the feeding, clothing, or supplying of your army? A. No; I did not. * * *

"Q. And generally you had difficulty in these unsettled conditions and with your great responsibility in having this properly done by your subordinates, I believe? A. I personally, to me personally, it was of not great difficulty, because I had in direct charge of that my men, my subordinate men, who had to look after the supplying of the army. He found it difficult, just like any other one, any time or in time of Civil War, because they were in direct charge with the minister of supplies, and it was difficult to secure all these things.

"Q. In that connection they requisitioned property, giving receipts for that to different individuals along the lines? A. I don't know anything about that; I again say I was not in charge of these matters.

"Q. Generally, didn't you know it to be a fact that certain of the supplies given to your officers were not obtained in the regular way, but of necessity were acquired from different individuals, to whom you gave receipts? A. No; there was no such thing I know of.

"Q. Did you ever make statements to that effect? A. I had not made statements like that. I have only made statements that my army was fed. I did not make statements that my army was fed through requisitions; that was impossible, because the army was supplied by the Allies.

"Q. I am not talking about food supplies. I am talking about other things. A. From food and munitions, they were supplied by the Allies, and I only knew the soldiers were so supplied, and didn't know the details of anything how they were supplied."

## He further testified:

"Q. You said in cases before, where the officers under you were unable to settle for requisitions, the matter was brought to your attention? A. If the commander of the army could not settle the problem himself, then he would bring it to me.

"Q. Where were you in the middle of December, 1919? A. In Chita.

"Q. Do you know the American consul, McGowan, at Vladivostok? A. No; I do not.

"Q. Did you ever hear of him? A. No; I know there was an American consul there, but I did not know who he was.

"By Mr. Greenbaum: Q. Do your remember receiving a telegram from him in December, 1919, in reference to the requisitioning of certain American goods? A. No; I do not.

"Q. Do you remember a requisition of property belonging to Nathan Salowezczks? A. No; I do not.

"Q. Consisting of furs and other merchandise of considerable value? A. No; I do not remember such a thing; all these would come there, and were settled and looked over by the proper general, who consisted of the minister of supplies or the quartermaster.

"Q. How were they settled generally? A. I think they were settled from the funds of the treasury.

"Q. Did you sign a written order of settlement, if you remember any case where a settlement could not be made by your subordinate officers? A. There were cases where I ordered them to make settlements, but who it was I don't remember. I did give general orders that, whatever the men did, they should pay; but the problem of paying for it was referred to the minister of supplies."

He also testified:

"Q. General, in some of these cases of requisitions, did you yourself sign them? A. No; never. I never had anything to do with it.

"Q. Did you have a regular form, where you would recommend payment of these particular cases that were referred to you? A. I repeat again I had nothing to do whatsoever with these. There were certain committees that had to look after that.

"Q. You yourself never signed any of these; is that right? A. Yes.

"Q. You are sure of that? A. I am sure."

He was shown a paper purporting to carry his signature which read as follows:

"I confirm herewith, after the examination, that the firm of C. B. Richards & Co. is to receive for requisitioned goods 37,520 gold rubles, which sum I promise to pay at the first demand.        [Signed]  Ataman Semenoff."

Then he was asked concerning it as follows:

"Q. Do you recall the requisition of C. B. Richards & Co., as referred to in this document, for 37,520 gold rubles for furs? A. No; I do not remember it.

"By Mr. Kahn: Q. Do you remember having obtained furs for the use of your army outside of the sources that your government had available? A. No; I do not know at all. I will tell you this: There were many claims, but I don't remember. I don't know whether this is about the particular furs, or furs in general.

"Q. Do you know whether any furs in general were taken by your army? A. No; I do not know if they took them or not, but there were claims made.

"Q. Did you look into these claims, to see if they were just? A. No; the court looked into that."

He further testified:

"Q. Is it not a fact, before you left China, the Omsk government was still paying on claims for seizure of goods? A. No; I again repeat there was no settlement work with me.

"Q. Is it not a fact that this committee, in co-operation with the Chinese government, are not making settlements for merchandise seized by your army? A. I don't know if they did or not, but they should make such settlement from the funds and merchandise that they have in their possession.

"Q. This merchandise they have in their possession, was that merchandise they got that was taken over during the military operations of your army? A. From whom?

"Q. From civilians and different people in the country? A. No.

"Q. Where were those goods obtained? A. I personally know that there have been military supplies, all kinds of munitions, for use of the Siberian army, which have been taken by the Chinese government; also wheat and probably money, and all this they can make use of.

"Q. I want you to tell me whether you know of the fact that certain merchandise was taken by your army during the course of your operations for which the Omsk government in co-operation with the Chinese government, is now making settlements at Harbin? A. That they have already paid?

"Q. Either they have paid or are paying? A. I have no knowledge of that.

"Q. What did you mean before when you told us about the committee of the Omsk government acting in co-operation with the Chinese at Harbin in adjusting claims against the Omsk government? A. There were claims made to the minister of supplies for certain supplies of which I have no knowledge. When the army was retreating from the Baikal region, the Chinese authorities had stopped the trains and got hold of all the munitions, wheat, bread, and probably money, and that is all in their possession."

He was asked as to the underwear and blankets used by his troops, and he stated that part of them came from Great Britain, and that he thought some came from the United States. He testified, too, as follows:

"Q. Don't you also know about clothes your army was wearing made out of material your army took in Siberia? A. No; this I have no knowledge of."

The following is a further excerpt from his testimony:

"Q. Now, General, I asked you about an American consul, McGowan, in Vladivostok. Does that refresh your recollection in reference to his report to you? A. I beg you to read it.

"Q. 'Exception has been taken to Ataman Semenoff to requisitioning merchandise amounting to $250,000 belonging to Nathan Solowczeska now at Srentensk.' Does that refresh your recollection? A. No.

"Q. Does it refresh your recollection when I read further: 'McGowan telegraphs to the Secretary of State of Washington, December 16, 1919, in part as follows: I have made protest to Semenoff?' A. No.

"Q. You don't recall that protest of the American consul? A. No.

"Q. Is it not a fact the American consul had protested to you on occasions in reference to the seizures? A. I don't remember a single instance.

"Q. If not personally to you, to you as the commander in chief? A. No; I don't remember such a thing.

"Q. Is that because you were receiving so many protests you can't remember which ones protested? A. I have not received any protests at all.

"Q. Not personally? A. No.

"Q. Do you recall that such messages were received at your headquarters, however? A. I have no knowledge; I have never had a protest reported to me.

"Q. All you say is you do not remember that? A. I have not had reported to me any such protests.

"Q. Do you say any such protests were received at headquarters? A. How can I say that, when I have not received any.

"Q. In other words, you do not know whether they were received at your headquarters? A. I don't know; but they didn't report to me such cases."

Another excerpt from his testimony shows how totally irrelevant and immaterial the questions he was asked and compelled to answer were:

"Q. When did you first serve under Admiral Kolchak? A. At the inception, when he became the head of the Omsk government.

"Q. The date, please? A. I don't remember exactly the date, but he came in power in 1919.

"Q. Is it a fact about that time you refused to co-operate with him? A. I want to know if I have to answer that question.

"Mr. Glaze: I think that question is quite improper.

"The Referee: What is the objection to answering?

"The Witness: It is in regard to general politics in Russia.

"The Referee: Objection overruled.

"A. Yes; that is a fact."

In the course of his examination the following occurred:

"Q. Do you know the Yokohoma Specie Bank, General? A. In what respect?

"Q. Do you know that such a bank as that exists? A. Yes; I know.

"Q. Did you ever have any money on deposit in that bank?

"Mr. Prentice: That is a question directly contrary to the ruling of Judge Hand.

"(Discussion between referee and counsel.)

"The Referee: I shall rule that, as I understand Judge Hand's ruling, this question is to be answered, subject to connection in the way of proof that, if he had any money in this bank, it was derived from the conversion into cash of property of the bankrupt, which this man improperly possessed himself of.

"Mr. Prentice: If that is the correct interpretation of Judge Hand's ruling, they can ask him about every individual thing. * * *

"Q. Did you ever have any money in that bank, the Yokohoma Specie Bank?

"Mr. Prentice: I advise Gen. Semenoff to state very respectfully under advice of counsel, he declines to answer.

"A. I follow the advice of my counsel and refuse to answer. * * *

"The Referee: Does he refuse to answer on the ground it might incriminate or degrade him?

"Mr. Prentice: No.

"The Referee: Then I direct him to answer the question.

"Mr. Prentice: I advise the witness to say, very respectfully, he declines to answer.

"The Witness: I fully depend upon the advice of my counsel, and, being in a strange country here, I am going to follow the advice of my counsel and fully trust in him."

Again he was asked:

"Q. Did you have a deposit of any gold in a bank in Chita?

"Mr. Prentice: I advise the witness to say, very respectfully, he declines to answer under advice of counsel.

"The Referee: Is this in connection with the same line as to the previous question, Mr. Kahn?

"Mr Kahn: Yes.

"The Referee: I direct the witness to answer.

"A. Following the advice of my counsel, I refuse to answer that question."

[7] An examination of the record fails to disclose that Semenoff had any knowledge of the bankrupt's acts, conduct, or property. The examination failed to disclose that he took or had in his possession at any time any of the property of the bankrupt. Thereupon counsel deliberately set to work to try and find out whether Semenoff himself had any property anywhere. The line of questioning shows unmistakably such an intention. The purpose was to ascertain whether the witness had any property of his own anywhere in the world, so that it would be worth while to pursue him in a plenary suit. To permit such an examination as this record reveals rests upon a singularly perverted view of the statute. In our opinion, Semenoff properly declined to answer the questions which he declined to answer under advice of counsel. Those questions, under the circumstances, were unauthorized and improper, and it was error to direct the witness to reply to them.

The examination of Semenoff under section 21a was not properly limited in its scope, and after he had been sufficiently examined to disclose that he had no knowledge or information relating to the acts, conduct, or property of the bankrupt, counsel were very improperly allowed to examine him upon a number of matters wholly foreign to the subject-matter of the inquiry.

The motion to vacate the order for the examination of Semenoff was properly denied; but the rulings directing him to answer the questions which, acting upon the advice of counsel, he declined to answer, were erroneous, and are reversed.