## In re CHARLOTTE TEXTILE CO.
### No. 86616.

United States District Court
S. D. New York.
May 15, 1950.

———◆———

Hahn & Golin, New York City, for trustee, J. Jacob Hahn, New York City.

David Haar, New York City, for Jacob Weissman, Sydney Levy, New York City.

McGOHEY, District Judge.

Jacob Weissman held at least 90% of Charlotte Textile Company's capital stock when it was adjudicated a bankrupt with an estimated deficiency for general creditors of $300,000 in November, 1949.[1] On February 8, 1950 he refused, on advice of counsel, to answer questions during an examination pursuant to Section 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a, although directed by the referee to do so. The questions sought information about assets Weissman received from the liquidation of wholly-owned corporations which were closely integrated with the bankrupt. The referee filed his certificate and ordered Weissman to show cause why he should not be punished.

From the transcript of testimony it appears that Weissman's counsel advised him not to answer because the questions were "outside of the scope of the examination relating to the acts, conduct and property of the bankrupt as such." The same argument was urged before me but the facts in my opinion do not support it. Indeed, they seem to me to demonstrate the contrary, and so I find that the questions all relate to the acts, conduct and property of the bankrupt.

The bankrupt was organized in North Carolina in 1945 with a total capital of $70,000, all of which was paid in by Weissman who continued to be its sole stockholder until "some time in 1948" when, he claims, he sold 10% of the stock to one Jess Lowen, the bankrupt's President.[2]

The bankrupt maunfactured and converted textiles which it sold to the drapery upholstery trade. Weissman, during at least part of the time after 1945, individually and through several wholly-owned corporations sold the same kind of materials as the bankrupt dealt in to some of the

1. Assignment for the benefit of creditors was made on September 1, 1949; an involuntary petition was filed on October 13, 1949.

2. Weissman says that Lowen "paid part of it in cash * * * and part of it in moneys that I owed him." (Tr. p. 354)

same trade as the bankrupt served. Among a larger number of Weissman's corporations were the following, which are involved here: Stanwood Textile Mills, Inc., Sherwood Textile Corporation, J. E. Weissman, Inc., Mercury Mills, Inc., Payntar Realty Corporation, Montgomery Factors Corporation.

Lowen, while President of the bankrupt, was also General Manager of these and the other Weissman corporations, though he was a stockholder of the bankrupt only and received his compensation from it alone. Weissman's "advice" was sought, received and followed by Lowen in this over-all management.

During the years 1945 through 1947 the bankrupt and the first four of the above-named wholly-owned corporations, and Weissman personally, stored their merchandise in the same warehouse, which was the property of Weissman's Payntar Realty Corporation. The merchandise was never segregated in any way nor was any formal record kept to show ownership of any part of it. Weissman says that either he or Lowen could tell whose it was merely by looking at it. It seems to have been treated as common property for it was billed out under various names through a system of exchanges directed by Lowen with Weissman's advice and approval. During this period accounts of these enterprises were factored through Montgomery Factors Corporation.[3] Weissman testified "the business was still mine whether it was Charlotte [the bankrupt], Haddon or any other instance." Frank Abrams & Company were accountants for Weissman individually, his wholly-owned corporations and the bankrupt. General accounting reports which he received monthly informed him about purchases, sales, operations, profit and loss, and accounts receivable and payable of all the various enterprises.

In September, 1948, about a year before the bankruptcy, Weissman, who then owed the bankrupt a balance of $251,915.30 on a larger debt, decided to liquidate some of his corporations including those named above. He says his decision was based on Lowen's and his own judgment to accept the recommendation of the accountants "to cut out all overhead and consolidating the business if possible into one." In the liquidation, Weissman received dividends consisting of accounts receivable, "possibly * * * some cash in the bank at that time", real estate and merchandise consisting of "rayon yarns and upholstery fabrics made of rayon yarns * * * in general of the type and character of merchandise which Charlotte had never dealt in before." Weissman retained part of these dividends, including the real estate, but transferred through book entries to the bankrupt the above described merchandise[4] at a value of $192,000 on account of his $251,915.30

3. On this point Weissman testified as follows:

"Q. Now, when did you organize Montgomery Factors Corporation? A. I think it might have been around 1946, I don't remember the date.

"Q. And was that Mr. Lowen's idea, too? A. Well, I don't remember.

"Q. Well, whose idea was it? A. I don't remember.

"Q. Who were the stockholders of Montgomery Factors? A. I am, sir.

"Q. The sole stockholder? A. Yes, sir.

"Q. And you don't recall now how the company came to be A. At that time it was necessary to protect the credit that was extended to outside customers and the best way to protect it was through a factoring arrangement. However, it was found at that time that it was rather costly and it was decided by myself, the accountant, Mr. Lowen, Mr. Field, the attorney, that the best way would be to organize a factoring of our own, and so it was organized.

"Q. With what capital? A. That I don't remember, sir.

"Q. And you don't remember the original capitalization? A. No, sir.

"Q. You don't recall how much money you invested? A. No, sir.

"Q. Did any of the other affiliated companies make an investment in Montgomery Factors Corporation A. They might have, sir.

"Q. You don't recall? A. Vaguely. However, the books would reveal all that information, I imagine.

"Q. You have no independent recollection? A. No, sir." (Tr. pp. 508-9)

4. It was not separately inventoried.

debt. The balance was apparently made up by transfer to the bankrupt of some accounts receivable, other claims, fixtures and perhaps some of the cash which "was in the bank at that time." In any event, on January 31, 1949, nine months before bankruptcy, the books of the bankrupt showed Weissman's debt discharged.

After the liquidation, the former business of the four corporations first named above was carried on by the bankrupt, and Weissman "came into Charlotte to operate the business with Mr. Lowen." He then went on its payroll at $400 per week, and "had equal voice in the decisions to be made in connection with the operations and management of the business." The bankrupt then took over the operation of two mills belonging to two other Weissman-owned corporations[5] in order to manufacture fabrics out of the yarns received in part payment of Weissman's debt. The bankrupt paid the mills some money monthly—how much Weissman could not recall—for the use of their machinery, facilities, patterns, etc.

To the foregoing might be added much more of similar import from Weissman's testimony, but it would unnecessarily extend this summary of the facts. What is here set down demonstrates, to me, that Weissman dominated and directed one large business enterprise of which the bankrupt and his other wholly-owned corporations were in fact merely departments, though in form they were separate corporations. They dealt in the same merchandise, a common stock in Weissman's warehouse, and they all sold it to the same general trade.

Weissman now says he did not know, prior to or even at the time of the discharge of his $251,915.30 debt to the bankrupt on January 31, 1949, that it was having difficulty paying its creditors. This is incredible. The accountants, whose monthly reports on all Weissman's corporations were received by him, say this was apparent as early as December, 1948. That was right in the period when Weissman was liquidating six named corporations so as "to cut out all overhead and consolidating the business if possible into one." And it is not disputed that shortly after it released Weissman of his debt, the bankrupt was pressed to get cash for insistent and questioning creditors.[6] By September 1, 1949, the bankrupt's condition moved its management to make the assignment for creditors. Then came the involuntary bankruptcy.

Weissman accepts as correct an inventory of all the bankrupt's merchandise as of January 31, 1949, and claims that it includes the merchandise credited at $192,000 against his debt to the bankrupt on the same date. The trustee's accountants report that accepting this inventory as true and correct, a subsequent one made after the assignment for creditors on September 1, 1949, reveals a shortage of 750,000 yards of merchandise.

Weissman testified on February 8, 1950, that Payntar Realty Corporation's warehouse in Long Island City was sold "about eight or ten months ago" and brought "about fifty some odd or maybe sixty thousand dollars", in cash after which the corporation was "liquidated and dissolved." At this point he began, on advice of counsel, to refuse to answer. The referee certifies as follows:

"5. The precise questions propounded to the said Jacob Weissman which he refused to answer are as follows:

"Q. And has Payntar Realty Corporation since been liquidated and dissolved? A. Yes, sir.

"Q. So that you now have that money?

"Mr. Levy: Don't answer that, Mr. Weissman." (s. m. p. 516)

*　*　*　*　*　*

"The Referee: I understand that perfectly and no slight is taken.

---

5. Haddon Mills, Inc. in Gloucester City, N. J., and Orchard Mills, Inc. in Philadelphia, Pa. These were not then liquidated but have been since.

6. This was done by factoring accounts through Hubschman Factors Corporation, which as far as now appears was not a Weissman enterprise.

"Mr. Weissman, having heard the statement of your counsel, I direct you to answer.

"The Witness: On advice of counsel I cannot answer this question." (s. m. p. 523)

\* \* \* \* \* \*

"Q. What sums did you receive by virtue of the sale of the property known as 325 Fourth Avenue, which property you in turn received as a liquidating dividend from Stanwood?

"Mr. Levy: Same objection.

"The Referee: Same ruling. I direct the witness to answer, and the witness has refused to answer on the advice of counsel.

"Q. Now as the result of the dissolution and liquidation of Mercury Mills, did you receive as a liquidating dividend stock in a company which owns real estate at 40 West 29th Street?

"Mr. Levy: Same objection.

"The Referee: Same ruling, as you are advised by counsel to do so.

"Q. Did Mercury Mills own the stock or any stock in a company known as 40 West 29th Street Corporation.

"Mr. Levy: I will have to make the same motion and the same objection, your Honor.

"The Referee: Same ruling, same direction and same refusal on the part of the witness.

"Q. Now, Mr. Weissman, I want you to tell me of the companies which were liquidated at or about January 31, 1949, what assets were turned over to you as a liquidating dividend from each company which were not in turn transferred to Charlotte Textile Company?

"Mr. Levy: Same objection, same motion, your Honor.

"The Referee: Same ruling, same direction, same refusal on the part of the witness to answer.

"Q. Now, Mr. Weissman, do you personally have a bank account?

"Mr. Levy: Same motion, same objection.

"The Referee: Same ruling, witness was directed to answer and refusal on the part of the witness to answer.

"Q. Mr. Weissman, do you maintain a safe deposit box?

"Mr. Levy: Same objection, same motion.

"The Referee: Same ruling, same direction, same refusal on the part of the witness.

"Q. Now, as the result of the liquidation of J. E. Weissman, Inc., and of Stanwood, and of Mercury, and of Sherwood Textile, did you receive by way of a liquidating dividend accounts receivable due and owing to these companies, or any of them?

"Mr. Levy: Same objection, same motion.

"The Referee: Same ruling, same direction to the witness, and refusal by the witness to answer upon advice of counsel, same ruling.

"Q. Now, as the result of the liquidation of Montgomery Factors Corporation what assets or other property of Montgomery Factors Corporation did you receive, Mr. Weissman?

"Mr. Levy: Same objection, same motion.

"The Referee: Same ruling, same direction, same refusal on the part of the witness to answer. Off the record. (s. m. p. 524, 525, 526)"

The trustee is obliged to use the procedure under Section 21, sub. a which is designed to enable him to discover and possess as soon as possible, all property of the bankrupt wherever it may be, for the protection of creditors. It would indeed be strange if he did not press for every detail of the liquidations so closely related in time at least to the bankrupt's crumbling and ultimate collapse. It is urged that he may not inquire if Weissman still has the avails of the sale of assets received in these liquidations. Surely, the trustee's expressed intention to institute proceedings to secure from Weissman moneys and property of the bankrupt creates no bar to the inquiry. Since Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476, pre-

sumptive possession is not enough, and so the trustee must ascertain the fact of possession. There is no better source of that information than Weissman.

In re Youroveta Home & Foreign Trade Co., 2 Cir., 288 Fed. 507, relied on by the respondent is clearly distinguishable. There was no showing there that the man under examination had any knowledge of the bankrupt's affairs. Weissman, as the summary of facts shows, stood in an entirely different relation to the bankrupt here. The trustee "should go into his financial affairs without reserve." Sachs v. Hadden, 2 Cir., 173 F.2d 929, 930.

It is difficult to understand that a man of Weissman's experience could believe that the questions did not relate to the "acts, conduct and property of the bankrupt." But the fact is that he was so advised by his counsel who also advised him that he need not answer. He will therefore be given another opportunity to comply with the referee's direction, which was clearly correct.

Submit an order providing for Weissman's examination to resume on two days' notice, and a direction to him to answer the questions refused. It will also provide that application for further relief may be made to me, if Weissman persists in refusing to answer.