**In re VALLEY FORGE PLAZA ASSOCIATES (A Pennsylvania Limited Partnership), Debtor.**

**Bankruptcy No. 89–11136S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 8, 1990.

Memorandum and Order Jan. 19, 1990.

Robert H. Levin, Max L. Lieberman, Philadelphia, Pa., for debtor.

Stuart M. Brown, Philadelphia, Pa., for Creditors' Committee.

James Peck, Philadelphia, Pa., for Dai–Ichi Kangyo Bank.

Jennifer Anderson, Dechert Price & Rhoads, Philadelphia, Pa., for Academy Life Ins. Co.

Richard F. Casher, Hartford, Conn., for Conn. Gen. Life Ins. Co.

Robert Heckscher, Philadelphia, Pa., for Midlantic Nat. Bank.

Alan Golden, Philadelphia, Pa., for Northeastern Bank.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

In the decision-making process, it is important to be consistent. However, it is more important to be correct. A consistent line of incorrect decisions is more properly nipped in the bud than promulgated purely for the sake of consistency.

Thus, despite acknowledgement of our statements in colloquies with the interested parties in this case suggesting that the Debtor in this large Chapter 11 case, VALLEY FORGE PLAZA ASSOCIATES (hereinafter "the Debtor"), would be entitled, under Bankruptcy Rule (hereinafter "B.Rule") 2004 (hereinafter "R2004"), to as broad access to examination of professionals hired by the creditors in this case as we were allowing the creditors to obtain from the Debtor's expert professionals, we find that we cannot act upon these statements because they were misguided. Given the underlying purpose of R2004 to aid discovery of a *debtor's* assets, we believe that the use of R2004 by a debtor is generally limited and is certainly no broader than that permitted by B.Rule 7026 and Federal Rule of Civil Procedure (hereinafter "F.R. Civ.P.") 26. Therefore, we will allow the Debtor's R2004 Applications directed at the creditors' expert professionals to only the limited extent authorized by F.R.Civ.P. 26(b)(4), *i.e.*, they may, through interrogatories, elicit only the subject matter of the experts' testimony, the substance of the facts and opinions to which the experts will testify, and a summary of the grounds for such opinions, with all reasonable costs incurred by the said experts in responding thereto to be borne by the Debtor.

This voluntary Chapter 11 case was filed on March 28, 1989. The Debtor is a partnership which owns a complex embracing a full-service convention center, two luxury hotels (the Sheraton and the Radisson), an office building, and substantial parking facilities situated in King of Prussia, Pennsylvania, a prime suburban Philadelphia community. The Debtor claims that its assets are valued at over $130 million.

The methods utilized to finance the construction of the complex, the construction services of which were conveniently supplied by Altemose Construction Co., the principals of which are also the Debtor's principals, was itself complicated. The land on which the complex was built was purchased by Academy Life Insurance Co. (hereinafter "Academy") and "rented" to the Debtor under a renewable 60–year "Agreement of Lease." Whether this arrangement is a "true lease," a joint venture, or a security arrangement, *see In re PCH Associates*, 804 F.2d 193, 196–201 (2d Cir.1986), *aff'g*, 60 B.R. 870 (S.D.N.Y.1986),

*aff'g*, 55 B.R. 273 (Bankr.S.D.N.Y.1985), is the subject matter of Adversary No. 89–0391S in this case, trial of which has been continued several times by agreement of the parties, most recently until January 10, 1990.

Putting aside the issue of whether Academy is also a secured creditor, there are three other parties which are indisputably large secured creditors: (1) Connecticut General Life Insurance Company (hereinafter "Cigna"), which has a first mortgage against the Sheraton Hotel and the office building and the other complex improvements in an amount of between $40 and $45 million; (2) Dai–Ichi Kangyo Bank, Ltd. (hereinafter "DKB"), which has a second mortgage on the convention center and a third mortgage on the hotels and office building in an amount in excess of $16 million; and (3) Midlantic National Bank (hereinafter "Midlantic"), which has a second mortgage on the Debtor's Radisson Hotel and a third mortgage on the convention center in an amount slightly less than DKB. There has been active participation by all of these secured creditors, plus the Official Unsecured Creditors' Committee (hereinafter "the Committee") and a large unsecured creditor, Northeastern Bank of Pennsylvania, throughout the case.

The roots of the present controversy can be traced to the first permanent cash collateral Order of April 26, 1989. The principal issue of dispute, in the drafting of that Order, was the degree of accommodation which the Debtor was obliged to make to employees of Price Waterhouse and Co. (hereinafter "PW"), an accounting firm employed jointly by counsel for Cigna, DKB, and Midlantic to analyze the finances of the Debtor. We allowed PW broad access to the Debtor's books, but also stated, in the April 26, 1989, Order, that PW's work-product would not be deemed privileged solely because they were employed by these creditors' counsel rather than by the creditors themselves. This provision was included because the Debtor expressed an intention to obtain access to PW's work-product at later, critical junctures in administration of this case.

On July 6, 1989, prior to the extension of the April 26, 1989, cash collateral Order by another Order of July 19, 1989, Cigna filed an Application under R2004 seeking to examine not only the Debtor and its principals, but certain employees of Laventhal & Horwath (hereinafter "L & H"), an accounting firm which the Debtor had hired as a "value counsellor." On July 26, 1989, the Debtor's first request to extend the exclusivity periods to file a plan and obtain acceptance thereof was heard. By ultimate agreement of counsel, the exclusivity periods were extended to September 20, 1989, and 60 days thereafter, respectively.

Also, on July 26, 1989, we engaged in a colloquy with interested counsel in which we indicated that not only did we believe that Cigna's request to examine L & H was appropriate, but that we believed that the Debtor would have similar access to comparable experts hired by the creditors. Ultimately, we granted Cigna's Application in an Order of August 15, 1989. While we do not believe that this Order was in any sense improvidently entered, we are compelled to retract our statements on July 26, 1989, which suggested that the Debtor's rights to examine the creditors' experts were as broad as those of the creditors to examine experts hired by the Debtor.

On September 7, 1989, and September 18, 1989, the Debtor filed the R2004 Applications before us. These included requests to examine employees of PW; Hospitality Valuation Services, Inc. an appraisal firm hired by Cigna; Pannell Kerr Forster, an appraisal firm hired by Midlantic; and Arnold Tesh Advisors, a similar firm hired by DKB. In addition to depositions of employees of these firms, and copies of any reports prepared by them, the Debtor sought, in its R2004 Applications, copies of all documents delivered to these firms in connection with their respective engagements concerning the Debtor; all background analyses and research undertaken by them; and copies of all documents generated by them in relation to their respective engagements. The articulated purpose for these requests was the Debtor's need to know the position of each of the creditors concerning a Plan, to which the Debtor's knowledge of the

valuation of its property by the creditors was deemed particularly relevant.

In mid-September, 1989, the Debtor shared an unfiled draft of a proposed Plan with its creditors. The Debtor requested a counter-response to the plan from the creditors, in order that it could seek to attain the preparation and ultimate confirmation of a consensual plan.

On September 20, 1989, the Debtor's exclusivity periods were extended, by agreement of all of the creditors, to October 27, 1989, and 60 days thereafter, respectively. The hope was expressed at that time by all involved that the creditors, as a group, would respond to the Debtor's proposed Plan by the late October date.

The creditors each responded vigorously to the instant R2004 Applications. The principal objections raised were that the Applications were premature because no plan contemplating any valuation of the complex had been proposed by the creditors and no plan at all had been filed; that the discovery sought was privileged; that the discovery sought was barred by F.R. Civ.P. 26(b)(4); and that, with respect to PW, the creditors had offered to supply this information only to be confronted with an unacceptable counter-demand from the Debtor that the creditors waive their claims to reimbursement for PW's fees which might otherwise be collectible under 11 U.S.C. § 506(b) in exchange for its accommodating the Debtor. A hearing on the Applications was scheduled on October 16, 1989.

The hearings on these Applications and the Debtor's further request to extend exclusivity were continued until November 15, 1989, with an extension of the exclusivity periods until shortly after that date and 60 days thereafter, respectively. However, by the time of the November hearings, it was becoming apparent that the creditor body was having difficulty reaching a consensus within itself, and hence in responding formally to the Debtor's proposed Plan with a counter-proposal. All parties expressed the hope that rescheduling hearings at 30–day intervals would bring these parties together and effect a consensus.

The exclusivity periods were hence extended to December 27, 1989, and 60 days thereafter, respectively, with a further hearing scheduled on December 20, 1989.

On November 15, 1989, the hearings on the Debtor's R2004 Applications were continued until November 22, 1989, on which date extended argument addressing same was received from all interested counsel. The Debtor's main contention was that allowance of the applications would be consistent with our statements in the colloquy of July 26, 1989. The creditors further articulated their various objections noted at page 673 *supra*. The parties agreed that the most relevant submission of legal authority pertinent to the propriety of the R2004 examinations was a Memorandum submitted by Cigna in favor of the R2004 Order entered upon its request for a R2004 examination of L & H on August 15, 1989.

The Committee, however, made the most persuasive argument. It noted that the parties were presently devoting their efforts to reaching a consensus as to a plan of reorganization, and that a round of contentious discovery and examinations would be counter-productive to such efforts. We therefore took the matter under advisement with the hope that consensus would soon begin to develop and that therefore resolution of the Applications would be unnecessary.

However, these matters took a different turn at the hearing of December 20, 1989, in which the Debtor sought to further extend its exclusivity periods. The creditor body, including the Committee, now took the curious position that termination of exclusivity would be conducive to a consensus, particularly among the creditors *inter se*, because, without pressure on the creditors to produce a plan, which denial of exclusivity would allegedly promote, the creditors were unlikely to expeditiously reach an agreement among themselves.

After a relatively short hearing on the Debtor's motion, we extended the Debtor's exclusivity periods to February 7, 1990, and 60 days thereafter, respectively. We concluded that the Debtor had, in the hearing, rather easily met its burden of establishing

that the instant case was very large, extremely complex, and that the Debtor had worked as diligently as it could, under the circumstances, towards formulating a consensual plan. *See In re Nicolet, Inc.*, 80 B.R. 733, 741–42 (Bankr.E.D.Pa.1987). We found that, until that day, the Debtor had been patiently and reasonably awaiting a creditor-consensus response to its drafted plan. We concluded that the Debtor was entitled some period to regroup its thinking and method of proceeding in light of the prospect that no creditor-consensus response was forthcoming. We did, however, establish April 2, 1990, a date just over a year after the filing of the case, as an outside deadline for the Debtor to prepare and file a Plan and Disclosure Statement or face dismissal or conversion of the case.

It appeared to us that, in light of these recent developments, further delay in deciding these Applications would be counterproductive. We are not sure what our rulings on them will accomplish in the scheme of the case. However, as an arbitrator of disputes among the parties and a facilitator of access to court resources to resolve disputes and not a draftsperson of confirmable plans, it is our duty to decide these matters—correctly on the law, irrespective of past informal remarks as to their likely outcome or the impact of our decision on the reorganization effort.

■ R2004 permits a party invoking it to undertake a broad inquiry of the examiner, in the nature of a "fishing expedition." *See, e.g., In re Fearn*, 96 B.R. 135, 137–38 (Bankr.S.D.Ohio 1989); *In re Wilcher*, 56 B.R. 428, 433 (Bankr.N.D.Ill.1985); 2 COLLIER ON BANKRUPTCY, ¶ 343.04, at 343–5 to 343–7 (15th ed. 1989); 9 COLLIER, *supra*, ¶ 7026.03, at 7026–7; and D. Pollard & J. Benton, *Examination of the Debtor Under Rule 2004 Is Key to Successful Litigation*, VOL. 1, NO. 2 BANKR. L.REV. 18, 18–19 (1989) (hereinafter cited as "Pollard"). The scope of a R2004 examination is even broader than that of discovery permitted under the F.R.Civ.P., which themselves contemplate broad, easy access to discovery. *See, e.g., Fearn, su-*

*pra*, 96 B.R. at 137–38; and *Wilcher, supra*, 56 B.R. at 433.

■ However, the breadth of scope of a R2004 examination derives from the particular purpose for which R2004 and its predecessor provisions under the Bankruptcy Act were promulgated. That is to allow a trustee, or others interested in accomplishing the same ends, to discover and investigate how to bring to light possession of assets of the debtor which might be intentionally concealed or overlooked in ignorance or haste. *See In re Cinderella Clothing Industries, Inc.*, 93 B.R. 373, 377–78 (Bankr.E.D.Pa.1988); *Wilcher, supra*, 56 B.R. at 433–34; *In re GHR Energy Corp.*, 35 B.R. 534, 536–37 (Bankr.D.Mass. 1983) (hereinafter cited as *"GHR II"*); *In re duPont Walston, Inc.*, 4 BCD 61, 63 (Bankr.S.D.N.Y.1978); 2 COLLIER, *supra*, ¶ 343.04, at 343–5 to 343–10; 9 COLLIER, *supra*, ¶ 7026.03, at 7026–7; and Pollard, *supra*, at 18–19. Third parties having knowledge of the debtor's affairs, as well as a debtor itself, are subject to examination. *See Wilcher, supra*, 56 B.R. at 434; 2 COLLIER, *supra*, ¶ 343.12, at 343–25 to 353–26; and Pollard, *supra*, at 19–20.

■ While a debtor may, in certain circumstances, invoke R2004, *see In re Public Service Co. of New Hampshire*, 91 B.R. 198, 199 (Bankr.D.N.H.1988); and *In re Analytical Systems, Inc.*, 71 B.R. 408, 410 (Bankr.N.D.Ga.1987), it is clear that R2004 "is creditor and trustee oriented." *GHR II, supra*, 35 B.R. at 537. Hence, the aura of mutuality and "tit-for-tat" between the Debtor and the creditors to which we expressed some receptivity at the hearing on July 26, 1989, was misplaced.

■ Moreover, once an adversary proceeding or a particular contested matter is under way, discovery sought in furtherance of litigation is subject to the F.R.Civ.P. rather than the broader bounds of R2004. *See In re Paramount Publix Corp.*, 82 F.2d 230, 233 (2d Cir.1936); *In re Kipp*, 86 B.R. 490, 491 (Bankr.W.D.Tex.1988); *Wilcher, supra*, 56 B.R. at 434; *GHR II, supra*, 35 B.R. at 538; *duPont Walston, supra*, 4 BCD at 63–64; 9 COLLIER, *supra*, ¶ 7026.03, at 7026–8; and Pollard, *su-*

*pra,* at 21–22. Many courts have expressed distaste for efforts of parties to utilize R2004 examinations to circumvent the restrictions of the F.R.Civ.P. in the context of adversary proceedings or contested matters. *See GHR II,* 35 B.R. at 538; *duPont Walston,* 4 BCD at 64; and 9 COLLIER, *supra,* ¶ 7026.03, at 7026–80. Pollard suggests that it is "tactically advantageous ... to submit the debtor to a Rule 2004 examination *before* filing a complaint," *id.* at 21, because thereafter more limited discovery subject to the F.R.Civ.P. will be all that is available. *Id.* at 22.

■ The admonition that the F.R.Civ.P. in general apply to discovery in adversary proceedings and contested matters has been specifically applied to prevent attempts to avoid the proscriptions of F.R.Civ.P. 26(b)(4) by the use of R2004. *See In re Continental Forge Co.,* 73 B.R. 1005, 1007 (Bankr.W.D.Pa.1987); *GHR II, supra,* 35 B.R. at 536–38; *In re GHR Energy Corp.,* 33 B.R. 451, 455 (Bankr.D.Mass. 1983) ("*GHR I*"); *In re Investment Bankers, Inc.,* 30 B.R. 883, 888–89 (Bankr.D. Colo.1983); and 9 COLLIER, *supra,* ¶ 7026.03, at 7016–8. Moreover, even if the F.R.Civ.P. do not apply to R2004 examinations, the lack of a procedural framework for R2004 proceedings may make "borrowing" from an applicable F.R.Civ.P. appropriate. *See Analytical Systems, supra,* 71 B.R. at 411–13 (F.R.Civ.P. 30 applied to R2004 examination).

■ Application of the foregoing applicable legal principles leaves the Debtor here in a dilemma which can only result in the conclusion that whatever discovery to which the Debtor is entitled, it is subject to the limitations of F.R.Civ.P. 26(b)(4). If the Debtor argues that confirmation of its plan or any other plan of reorganization is not at issue, then it must confront the creditors' argument that the Applications are premature. The Debtor does not have, at its disposal, the free-floating purpose of discovery of assets which would justify a "tactically advantageous pre-proceeding" fishing. expedition, *see* Pollard quotation at page 675 *supra,* as in the case of Cigna's earlier attempt to take a R2004 examination of pertinent persons employed by L & H. On the other hand, if the Debtor argues that the dispute over proposal and confirmation of plans should be deemed to be a contested matter at issue, then the Debtor's discovery tools are limited by the F.R.Civ.P. under the principle that discovery in any contested matter is always so circumscribed.

■ We believe that each of the creditors' experts which the Debtor seeks to examine are fair game for examination, as no recognizable privilege applies. The courts appear to agree that accountants (such as PW) are not entitled to claim a general accountant-client privilege. *See, e.g., Couch v. United States,* 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973); *In re International Horizons, Inc.,* 689 F.2d 996, 1002–05 (11th Cir.1982); and *In re Oxford Royal Mushroom Products, Inc.,* 41 B.R. 863 (Bankr., E.D.Pa.1984). No general appraiser-client privilege is known to this court. However, we also conclude that the Debtor is restricted in the scope of the discovery sought, in the instant Applications from expert witnesses of its adversaries by the terms of B.Rule 7026, incorporating F.R.Civ.P. 26(b)(4), which provides as follows:

> (4) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>
> (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(4)(C) of this rule, concerning

fees and expenses as the court may deem appropriate.

(B) A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

(C) Unless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under subdivisions (b)(4)(A)(ii) and (b)(4)(B) of this rule; and (ii) with respect to discovery obtained under subdivision (b)(4)(A)(ii) of this rule the court may require, and with respect to discovery obtained under subdivision (b)(4)(B) of this rule the court shall require, the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.

F.R.Civ.P. 26(b)(4)(A) restricts the party making requests of experts to discovery of only the identity of the expert, the subject matter of the expert's testimony, the facts and opinions to which the expert is to testify, and a summary of the grounds for the opinion. Further discovery should, in our view, only be allowed after the taking of the limited discovery specifically authorized by 26(b)(4)(A) and should only be permitted, if at all, only upon a showing of why any such further discovery is necessary and appropriate.

■ F.R.Civ.P. 26(b)(4)(C) is probative as to the issue that has been the only factor delaying the supplying of at least some of PW's work-product to the Debtor. Ordinarily, the party taking discovery must pay a reasonable fee, including reimbursement of reasonable costs, see, e.g., Hockley v. Zent, Inc., 89 F.R.D. 26, 29 (M.D.Pa.1980), to the expert from which discovery is sought. There is no basis on which we can conclude that "manifest injustice would result" such that an exception to the Debtor's obligation to shoulder such costs can be made under the terms of F.R.Civ.P. 26(b)(4)(C). We are not prepared to conclude that manifest injustice results simply because the party who is obligated to reimburse the creditors' experts for their time and costs expanded in submitting to the Debtor's R2004 examination is a debtor. There has been no showing that this particular debtor is impecunious nor that the fees to be demanded are so substantial that this debtor cannot bear them. Pending such a showing, we conclude that the Debtor must pay a reasonable fee and costs to the creditors' experts which it seeks to depose. It is therefore of little importance whether the Debtor would be liable for the fees and costs of the creditors' experts under § 506(b) in ascertaining whether the charges arising from their submission to the Debtor's examination are chargeable to the Debtor. These particular fees and costs will be chargeable, under the terms of our Order, in any event, if the discovery is made.

Therefore, an Order granting the Debtor's Applications only insofar as the R2004 examinations conducted thereto are subject to the restrictions of F.R.Civ.P. 26(b)(4) will be entered. We shall also direct that the Debtor pay the reasonable costs and fees of the creditors' experts, authorizing the Debtor to expend its funds for that purpose.

## MEMORANDUM AND ORDER

Late in the afternoon of Wednesday, January 17, 1990, and in the middle of the day on Thursday, January 18, 1990, nine and ten days, respectively, after we issued our Opinion an Order of Monday, January 8, 1990, granting to a limited degree, the Applications by the debtor for R2004 Examinations of certain experts hired by Cigna, DKB, and Midlantic (or their counsel) [1] and

1. All of the abbreviations utilized in the Opinion and Order, January 8, 1990, are utilized herein

requiring production of certain documents by Monday, January 22, 1990, we received copies of motions to reconsider our Order and to stay same ex parte on the grounds that our Order was inconsistent with our Opinion. As author of both the Opinion and the Order, we consider ourselves uniquely qualified to determine this matter summarily. A very quick response, without a hearing, is necessary because it would be very inconvenient to schedule a hearing prior to January 22, 1990, given the belated presentation of these motions, and because the matter presently is simply an issue of the interpretation of our Opinion.

The purported inconsistencies of the Order with our Opinion and our response to each are as follows:

1. There is no contested matter pending, rendering use of the F.R.Civ.P. inappropriate. Therefore, the Examinations should not be permitted at this time.

Response: As the lengthy recitation of the history of the case we hoped had made clear, we consider the confirmation process to be presently at issue. See Opinion at 3–9. As the debtor must prepare its Plan and Disclosure Statement by April 2, 1990, the process of obtaining the discovery sought in connection therewith therefore could not be delayed.

■ 2. Requiring the experts to produce documents created in preparation of their final products is beyond the scope of F.R.Civ.P. 26(b)(4).

Response: Such materials are an aspect of the *grounds* of its experts' opinions, which are discoverable per F.R.Civ.P. 26(b)(4)(A)(i). We believed that production of these documents is particularly appropriate here because:

(a) The debtor is only being permitted to recover documents, not take a deposition, which would probably permit more detailed probing of preparatory materials; and

(b) The experts may not have completed a final product as of January 22, 1990, but, given the short period until the debtor must produce a Plan and Disclosure Statement, the debtor is entitled to recovery of such materials as have been produced by the experts as of January 22, 1990.

■ 3. The experts were retained by counsel, not the creditors themselves, and presumably, it is contended that all of their work product is privileged.

Response: As we indicated in our Order of April 26, 1989, discussed at page 4 of our Opinion, we decline to accept this contention as a basis for blocking discovery. Many experts are hired, in a direct sense, by counsel. However, they are hired for an engagement of the client. Therefore, their work product produced on behalf of a client is not, for that reason, beyond the scope of discovery.

We conclude that our Order of January 8, 1990, is not inconsistent with the accompanying Opinion of the same date.

Therefore, the Motions of Cigna, DKB, and Midlantic seeking reconsideration and a stay of our Order of January 8, 1990, are DENIED.

without further description or explanation of same, because it is assumed that the readers of this Memorandum will have been readers of the Opinion and Order.