**In re the DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

**(Jointly Administered).**

**Bankruptcy No. 90 B 10421 (FGC).**

United States Bankruptcy Court, S.D. New York.

Jan. 17, 1991.

G. Davis, P. Gruenberger, A. Miller, J. Rapisard, L. Steinman, Weil, Gotshal & Manges, New York City, for Drexel Burnham Lambert Group, Inc., et al., debtors-in-possession (DBL).

C. Graham, Thacher, Proffitt & Wood, New York City, for the Federal Deposit Ins. Corp. and the Resolution Trust Corp. (FDIC/RTC).

M. Kirschner, Jones, Day, Reavis & Pogue, New York City, for Official Committee of Unsecured Creditors of Drexel Burnham Lambert Group, Inc. (Group Committee).

M. Zelmanovitz, Zalkin, Rodin & Goodman, New York City, for Official Committee of Unsecured Creditors of Drexel Burnham Lambert, Inc. (Inc. Committee).

## MEMORANDUM OF DECISION ON RULE 2004 EXAMINATION

FRANCIS G. CONRAD, Bankruptcy Judge.

This contested matter[1] is before us on the motion of FDIC/RTC to participate in future Rules of Practice and Procedure in Bankruptcy Rule 2004 examinations being

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the General Reference Order to this Court, dated July 10, 1984 (Ward, C.J.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes conclusions of law under F.R.Civ.P. 52, as made applicable by Rules of Practice and Procedure in Bankruptcy Rule 7052 and Rule 9014.

conducted by DBL, Group Committee, and Inc. Committee, and FDIC/RTC's request for an order directing DBL, Group Committee, and Inc. Committee to produce Rule 2004 examination transcripts, exhibits, and documents. The motion, as modified,[2] is granted because FDIC/RTC is a party in interest and good cause is shown why FDIC/RTC should have the requested documents.

On February 13, 1990, DBL's parent filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101, et seq. Later, on May 29, 1990, Drexel Burnham Lambert, Inc., a subsidiary, and fourteen (14) of its affiliates filed voluntary Chapter 11 petitions. Involuntary petitions were also filed against DBL affiliates Drexel Burnham Lambert Trading Corporation, on May 9, 1990, and Drexel Burnham Lambert Trade Finance, Inc., on May 15, 1990. These later two debtors consented to the entry of orders of relief and are now voluntary Chapter 11 cases. Another related entity, Drexel Burnham Lambert Government Securities, Inc. also filed under Chapter 11 on June 20, 1990. All the cases were procedurally consolidated by Judge Buschman. DBL continues as a debtor-in-possession under §§ 1107 and 1108.

From May 16, 1990 through August 28, 1990, this Court granted the applications of several official committees to conduct Rule 2004 examinations and to receive the production of documents thereunder. We are informed that several formal and informal Rule 2004 examinations took place and documents were produced subject to confidentiality agreements between and among the parties. We are further informed that the parties who conducted the Rule 2004 examinations presently possess or control the transcripts, exhibits, and documents produced.

FDIC/RTC acts as a receiver or conservator for approximately 700 failed thrift institutions (Thrifts). Many of the Thrifts hold securities that were purchased in transactions with DBL entities or through other transactions in which DBL entities participated. A number of Thrifts (less than 50) hold claims against DBL entities.

The FDIC/RTC claims are the subject of an enormous claims investigation process. This process is ongoing. On the November 15, 1990 claims bar date ordered under Rules of Practice and Procedure in Bankruptcy Rule 3003, FDIC/RTC filed multibillion dollar claims. According to FDIC/RTC's counsel, however, many of the filed claims are incomplete and still require investigation.

FDIC/RTC moved the Court, on June 29, 1990, for an order directing, among other things, participation in ongoing Rule 2004 examinations and the production of documents. This motion was settled by a "So Ordered" stipulation on August 3, 1990, which directed some document production to FDIC/RTC, but no examination. Some progress was made under this stipulation, but obviously it wasn't enough because FDIC/RTC's renewed its Rule 2004 motion.

FDIC/RTC's motion, boiled down to its critical mass, seeks the fruits of the Rule 2004 examinations taken by others to amass and develop support for its claims[3] against DBL's estate. See, FDIC/RTC Memorandum of Law, pp. 2–3.

DBL and its various committees oppose the Rule 2004 motion.[4] For cause, DBL raises relevance and confidentiality concerns, and the status of FDIC/RTC as a potential adversary.

**2.** At the November 15, 1990 hearing on the motion, FDIC/RTC withdrew its request to participate in the future 2004 examinations. Thus, we address only the requested production.

**3.** Originally, the 2004 motion may have been in tandem, perhaps it was the tractor that pulled FDIC/RTC's motion to extend the claims bar date. In the exercise of our discretion and balancing of the equities between the parties, we refused to extend the November 15, 1990 claims bar date. The present request now supports only potential claims amendments and possibly claims litigation.

**4.** For purposes of this Memorandum of Decision only, we will refer to the debtor (DBL) only, but the term includes the various committees who have also filed pleadings and papers in opposition to FDIC/RTC's motion.

DLB's relevance argument focuses on the subject matter of the Rule 2004 examinations. In supporting affidavits to its opposition, DBL says the 2004 questioning focused on the identification of potential claims against third parties from which DBL may recover assets. Specifically, the examinations focused on:

1) the debtor's repurchase of its stock from employees for several hundred million dollars at prices that are believed to be well in excess of the stock's actual value;

2) the payment in 1989 and 1990 and on the eve of bankruptcy of several hundred million dollars in bonuses and commissions;

3) the mass liquidation of the assets of the debtor and its subsidiaries in the period immediately preceding and following the filing of the parent petition on February 13, 1990;

4) the transactions entered into between current or former employees and the debtor or its subsidiaries (a) transferring entire lines of business or significant parts thereof, (b) awarding fees to such employees on consummated and unconsummated deals, or (c) disposing of other tangible or intangible assets for less than fair market value;

5) the payments, including bonuses, salary or attorney's fees until as recently as February 13, 1990, to or for the benefit of then current and former employees whose activities precipitated Drexel's liability for over $650 million in criminal and civil fines and penalties, as well as an undetermined liability in various multi-million dollar class-action lawsuits;

6) the creation of and transactions with the reportedly over several hundred so-called "employee investment partnerships" established to permit Drexel employees to invest in the transactions generated by the High Yield Bond and other departments; and

7) the circumstances and events leading to the debtor and its subsidiary, Drexel Burnham Lambert, Inc.'s decision to enter into a Plea Agreement with the Government, dated January 24, 1989.

DBL claims that in one isolated instance only, in the Kissich examination, has the thrift or the savings and loan issue arisen.

As for its second defense to FDIC/RTC's request, DBL raises several issues of confidentiality.

As set forth in the accompanying Certificate ... the Rule 2004 examination, and the attendant production of documents, were undertaken under a explicit understanding among all the Committees, Debtors, and the witnesses that the transcripts and designated documents would remain strictly confidential—i.e., that their distribution would be limited to Committee Members and their professional advisors (such as counsel and accountants), and in some instances, the professional advisors alone.

Debtor's Response to FDIC/RTC Motion, p. 8 (footnote omitted).

Exhibits attached to DBL's response indicate DBL and the committees have indeed entered into confidentiality agreements. *See,* Exhibits 2, 3, 4, 5, & 6, attached to Debtor's Response to FDIC/RTC Motion. The confidentiality agreements are private agreements, and not one has been "So Ordered" by the Court.

DBL's third defense pertains to FDIC/RTC's status as the receiver or conservator for approximately 700 failed Thrifts. DBL points out that FDIC/RTC has already filed at least one adversary proceeding against DBL Group, Inc. and DBL Products Corp., AP No. 90–6332A, and now acts as receiver or conservator for several Thrifts that have pending actions against DBL outside of bankruptcy. Moreover, FDIC/RTC is a participant in an informal creditors group, formed by a Court approved stipulation (the Stipulation), known as the Securities Litigation Claimants Group (SLCG).[5] *See,* Exhibit 8 at-

---

**5.** Various parties have phonetically referred to SLCG as "slug." We are not sure if this unusual phonetic pronunciation is a product of the New

tached to Debtor's Response to FDIC/RTC Motion. FDIC/RTC became a member of SLCG upon the express representation it would withdraw a motion seeking a committee of securities fraud litigation claimants. *Id.*, at p. 2.

SLCG is neither an official nor an unofficial committee. Its members, unlike members of officially appointed committees, have no fiduciary obligations under the Bankruptcy Code. Under the Stipulation, however, SLCG is granted "party in interest" status under § 1109.[6] *Id.*, at p. 5.

The Stipulation pinpoints the reorganization areas the parties will negotiate[7] and hints under the "Recitals" that agreements may be made "between SLCG and Debtors regarding the disclosure of documents, and such other agreements as the (sic) SLCG may designate." *Id.*, at p. 4. The Stipulation satisfies several Rule 2004 "scope" areas.

A fair reading of the document would lead one to conclude that SLCG, of which FDIC/RTC is a member, may negotiate agreements with DBL and its committees to obtain documents pertaining to the reorganization process, specifically, the plan, disclosure statement, and claims treatment.

Under the Stipulation, DBL and SLCG entered into a Confidentiality Agreement, dated August 3, 1990. Exhibit 9 attached to Debtor's Response to FDIC/RTC Motion. Although FDIC/RTC is specifically excluded from this agreement, DBL and FDIC/RTC did enter into an "Agreed Protective Order," dated August 3, 1990. Exhibit 10, *id.* Both of these agreements are similar to the confidentiality agreements entered into by the official committees with DBL. *See*, Exhibits 3, 4, 5, & 6, *supra.*

DLB claims it produced documents under the document stipulation, dated August 3, 1990, with FDIC/RTC, and that FDIC/RTC did not attempt any further requests for additional documents until October 11, 1990. See, Exhibit 7 attached to Debtor's Response ·to FDIC/RTC Motion. FDIC/RTC convincingly disputes DBL's claim of delay. See, Reply Affidavit of C.F. Graham in Further Support of FDIC/RTC Rule 2004 Motion. Moreover, the document stipulation between FDIC/RTC and DBL specifically preserved FDIC/RTC's right to seek additional Rule 2004 production and information. *See*, Exhibit 7 attached to Debtor's Response to FDIC/RTC Motion.

After DBL filed its response to FDIC/RTC's Rule 2004 request, FDIC/RTC fitfully awakened and responded to DBL's defenses. In response to the relevancy defense, it simply argues that the information it seeks is "relevant to the claims of the FDIC/RTC in this bankruptcy." *Id.*, at p. 3.

As to the confidentiality issue, FDIC/RTC asserts the argument is "utter-

---

York dialect we hear. in Court, or from more profound cerebral formations.

**6.** 11 U.S.C. § 1109, **Right to be heard,** provides:

(a) The Securities and Exchange Commission may raise and appear and be heard on any issue in a case under this chapter, but the Securities and Exchange Commission may not appeal from any judgment, order, or decree entered in the case.

(b) A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holder, or any indenture trustee, may raise and appear and be heard on any issue in a case under this chapter.

**7.** The reorganization areas include:

2. The Drexel Entities, the Official Committees and representatives of the SLCG agree to negotiate among each other as if the SLCG were an Official Committee, with respect to:

(A) the terms and conditions of any proposed plan of reorganization or liquidation of the Drexel Entities (or any of them) prior to the filing of any such plan with the Bankruptcy Court;

(B) the language of any disclosure statement with respect to any plan proposed to be filed by the Drexel Entities or any of the Official Committees; and

(C) the terms and provisions of any procedures to be proposed to the Bankruptcy Court pertaining to the treatment of litigation or securities arbitration claims including, without limitation, procedures for estimation of such claims for voting, feasibility or allowance purposes, in advance of any requests, either by motion or otherwise, being made to the Bankruptcy Court for the establishment of such procedures....

Stipulation and Order Establishing a Securities Litigation Claimants Group, dated August 3, 1990.

ly baseless." It says its Agreed Protective Order will afford confidentiality. Moreover, and more compelling, FDIC/RTC argues that under the various confidentiality agreements, creditors who are members of official committees are entitled to utilize such information in pursuing their claims against DBL. *See, i.e.,* Exhibit 4, p. 6; Exhibit 5, p. 7; Exhibit 6, p. 10.[8] FDIC/RTC provided no response to the adversary proceeding argument.

## DISCUSSION

Any discussion of a procedural rule must begin with the rule itself. Rules of Practice and Procedure in Bankruptcy Rule 2004, **Examination**, provides in pertinent part:

(a) Examination on Motion. On motion of any party in interest, the court may order the examination of any entity.[9]

(b) Scope of Examination. The examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge. In an individual's debt adjustment case under chapter 13 or a reorganization case under chapter 11 of the Code, other than for the reorganization of a railroad, the examination may also relate to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan.

(c) Compelling Attendance and Production of Documentary Evidence. The attendance of an entity for examination and the production of documentary evidence may be compelled in the manner provided in Rule 9016 for the attendance of witnesses at a hearing or trial.

Subdivision (a) is derived from former Bankruptcy Rule 205(a); subdivision (b) from former Rules 205(b) and 11–26; and subdivision (c) is substantially declaratory of the practice that had developed under § 21(a) of the Act.[10] *See,* Advisory Committee Note (1988). *See generally,* 2 *Colliers on Bankruptcy* (Matthew Bender), ¶¶ 343.02, 343.08, 343.11, 343.13 and 8 *Colliers on Bankruptcy* (Matthew Bender), ¶ 2004.01 (15th Ed.1990).

To understand our ruling it is necessary to go back in time to review the declaratory practice under Rule 205 and §§ 21(a) and 7(a)(10) of the Act. Rule 205, **Examination**, provided in pertinent part:

(a) Examination on Application. Upon application of any party in interest, the court may order the examination of any person. The application shall be in writing unless made during a hearing or examination or unless a local rule otherwise provides.

(b) Examination of Bankrupt at First Meeting. At the first meeting of creditors, the court shall publicly examine the bankrupt or cause him to be examined and may permit any party in interest to examine the bankrupt.

---

**8.** The clause FDIC/RTC points to read as follows:

> All Confidential Information received from Debtor by any Committee Member will be used by such Committee Member solely for the purpose of dealing with such Committee Members interest in, or claims against, the Debtor or otherwise dealing with Debtor's Chapter 11 case.

Exhibit 3 is phrased differently from Exhibits 4, 5, and 6, but the intent is the same, *see,* pp. 6 & 7. Exhibit 9, between SLCG and DBL, is also phrased differently from the other agreements, but its intent is the same, *see,* pp. 8 & 9. Exhibit 9 specifically excludes FDIC/RTC from its reach. *But see,* Exhibit 10, p. 5. This agreement is between FDIC/RTC and DBL, and it also contains a similarly worded confidentiality clause.

**9.** The word "entity" was changed from "person" in 1987 to encompass the broader category of "things" not included in person.

**10.** Act refers to the Bankruptcy Act of 1898, as amended, 30 Stat. at L. 552, Chap. 54, *et seq.,* as Code refers to the 1978 Bankruptcy Code, P.L. 95–598, Title I, § 101, 92 Stat. 2549. The 1978 Code repealed the 1898 Act, as amended.

(c) Bankruptcy Judge to Preside. The bankruptcy judge shall preside at any examination under subdivision (b) of this rule.

(d) Scope of Examination. The examination under subdivisions (a) and (b) of this rule may relate only to the acts, conduct, or propriety of the bankrupt, or to any matter which may affect the administration of the bankrupt's estate, or to his right to discharge....

Section 7(a)(10) provided in pertinent part: The bankrupt shall ... (10) at the first meeting of his creditors, at the hearing upon objections, if any, to his discharge and at such other times as the court shall order, submit to an examination concerning the conducting of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may effect the administration and settlement of his estate or the granting of his discharge; but no testimony, or any evidence which is directly or indirectly derived from such testimony, given by him shall be offered in evidence against him in any criminal proceeding, except such testimony as may be given by him in the hearing upon objections to his discharge....

Section 21(a) provided in pertinent part: [§ 21(a)]: The court may, upon application of any officer, bankrupt, or creditor, by order require any designated persons, including the bankrupt and his or her spouse, to appear before the court or before the judge of any State court, to be examined concerning the acts, conduct, or property of a bankrupt....

█ A trustee in bankruptcy, under the Act and the Code, is under a duty to maximize the realization of estate liquidation. To that end a trustee must marshal the estate's assets and, if necessary to achieve that end, institute all necessary litigation.

█ When a trustee takes over a Chapter 7 case, the trustee must learn quickly about the debtor entity. One of the original purposes of the 2004 examination (formerly 205) was to assist the trustee in this endeavor. *See, Zydney v. New York Credit Men's Association,* 113 F.2d 986 (2d Cir. 1940). Thus, a long line of cases, starting with *Cameron v. U.S.,* 231 U.S. 710, 34 S.Ct. 244, 58 L.Ed. 448 (1914), have defined the purpose [11] of a 2004 examination. The object of the examination of the bankrupt [12] and other witnesses is to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved. *Id.,* at 717, 34 S.Ct. at 246, 58 L.Ed. at 452.

In one of the earliest published cases involving the scope of inquiry of a non-bankrupt under the Act, the District Court in *In re Foerst* said:

There is no precise rule governing the admissibility of such testimony, other than that it should be reasonably pertinent to the subject of inquiry. In general, a large latitude of inquiry should be allowed in the examination of persons closely connected with the bankrupt in

---

**11.** *See, In re Samuels,* 215 F. 845 (2d Cir.1914) ("[§ 21a] intended to and provides a searching and summary method for the discovery of holder assets.... The proceeding it authorizes is meant to assist the trustee in discovery and collecting assets."). *See also, Ulmer v. U.S.,* 219 F. 641, 645 (6th Cir.1915) ("(T)hat upon such examination (§ 21a) no specific issue is or can be made up, but any fact or circumstance is relevant and material which fairly tends to establish something which may become important in the administration of the estate. The existence of rights of the bankrupt are instances of matters properly subject to investigation."). *Accord, Peoples Bank v. Brown,* 112 F. 652 (3d Cir.1902); *In re Yirouveta Home & Foreign Trade,* 288 F. 507 (2d Cir.1923); *Freeman v.*

*Seligson,* 405 F.2d 1326 (D.C.Cir.1968) (Rule 2004 fulfills trustee's duties.); *In re Valley Forge Plaza Associates,* 109 B.R. 669, 674, 15 F.R. Serv.3d 1102 (Bkrtcy.E.D.Pa.1990), *recon. denied, stay denied,* 1990 WL 1220, 1990 Bankr. Lexis 59, 16 F.R.Serv.3d 87 (Bkrtcy.E.D.Pa.1990) (same); *In re Larkham,* 24 B.R. 70, 72 (Bkrtcy. D.Vt.1982) (the field of inquiry is wide.); *In re GHR Energy Corp.,* 33 B.R. 451, 453, 10 BCD 1432, 9 CBC.2d 516 (Bkrtcy.D.Mass.1983) (the scope of a Rule 2004 examination is unfettered and broad.).

**12.** The term debtor is used in the 1978 Code as opposed to the term bankrupt which was used under the Act.

business dealings, or otherwise, for the purpose of discovering assets and unearthing frauds, upon any reasonable surmise that they have assets of the debtor. The intent of the bankrupt law is that only the debtor dealing honestly with his property shall be discharged; and that any proper assets of the estate, however concealed, shall be made available to creditors. The examination for this purpose is of necessity to a considerable extent a fishing examination. The extent to which it shall be permitted to go, must be determined by the sound judgment of the officer before whom it is taken. Reasonable examination should not be allowed to be checked by constant objections that the materiality of the answer may not be immediately apparent, where no harm can arise to the witness from the disclosure, if the transaction is honest. If the result of such an examination may often be a considerable amount of immaterial testimony, this is a much less evil than to stifle examination by technical rules which would defeat the purpose of the act, and discredit the administration of the law in the interest of creditors. Unreasonable discursiveness in the examination will be in some measure checked by making it at the expense of the examining party; if plainly frivolous or prolix, it should be stopped. Where questionable proceedings have been disclosed, greater latitude in the prosecution of inquiries should be allowed; and the precise form or order in which the questions are put can scarcely be deemed material.

Upon the above general principles, and upon the matters already disclosed on this examination, I think the witness should answer as respects any moneys or property acquired by her during the year prior to the adjudication, or even further back, should further testimony show such inquiries to be reasonably pertinent. *In re Foerst*, 93 F. 190, 191 (S.D.N.Y.1899).

*Foerst* was quickly followed by *In re Saur*, 122 F. 101 (S.D.N.Y.1903). There, creditors who had a reclamation claim against the estate applied for an order compelling the trustee to file with the referee the books and records of the bankrupt's estate. The trustee refused because the communication of the information to potential claimants would prejudice the defense of the reclamation proceeding. The District Court reversed the referee, holding that any person interested in an estate has an absolute statutory right to the inspection of all accounts and papers, and to be furnished with information about the estate. "It might happen that the bankrupt's papers would furnish the only evidence to support the reclaiming creditors' claim. It is not the duty of a trustee to resist every reclamation proceeding. It is his duty to investigate every such claim, and to resist those that ought to be resisted, and I think that a reclaiming creditor has the same rights as any other creditor in a bankruptcy proceeding to inspect all the accounts and papers." *Id.*, at 103. *See, In re Samuelsohn*, 174 F. 911 (W.D.N.Y.1909) (A creditor of a bankrupt is entitled to information even though claim is not formerly proved.) *See also, Petition of Moulthrop*, 41 ABR 654 (6th Cir.1918) (Bankrupt entitled to be furnished a copy of his testimony taken under § 21(a) (11 U.S.C. § 44(a).); *In re Paramount Publix Corporation*, 82 F.2d 230 (2d Cir.1936) (§ 21(a) applies to proceedings under § 77(b).)

In a case similar to the request of FDIC/RTC, *Winton Shirt Corporation v. Elizabeth Trust Co.*, 104 F.2d 777 (3rd Cir.1939), a bank examiner who had examined the affairs of Elizabeth Trust (Bank) had been subpoenaed and examined under § 21(a). When Bank attempted to procure a transcript of the examiner's testimony, the request was refused by the referee. For cause, the referee found that the application for a copy of the testimony was made for the benefit of Bank as a litigant, not as a creditor, because the trustee was preparing a plenary suit against Bank. Affirming the District Court's reversal of the referee, the Third Circuit held that it would be inequitable to permit the trustee to require the Bank to produce a report by means of a subpoena and not grant Bank a right to examine testimony relating to the subpoenaed document. *Id.*, at 780. And it

is no defense to the production of information that an applicant for an examination seeks information to prosecute an action against the witness. *See, In re Paramount Publix Corporation,* 82 F.2d 230 (2d Cir.1936); *Marx v. Chase Nat. Bank,* 117 F.2d 800 (2d Cir.1941); *Freeman v. Seligson,* 405 F.2d 1326, 1337 (D.C.Cir. 1968). *See, In re Table Talk, Inc.,* 51 B.R. 143 (Bkrtcy.D.Mass.1985) (Pending litigation against person sought to be examined under Rule 2004 and possible use of such testimony in collateral litigation is not sufficient reason for denying examination. Moreover, even if a future anti-trust action may be subject to mandatory withdrawal, a Rule 2004 examination is not precluded.). *But see, In the Matter of Bruce Joseph LaCasse,* 2 BCD 1280 (Bkrtcy.D.Minn.1976) (Rule 2004 discovery seeking grounds that can be used to object to dischargeability is beyond the scope of the rule.). *See also, Travis v. United States,* 123 F.2d 268, 271 (10th Cir.1941) (Rule 2004 examination cannot extend to dealings, transactions, or issues over which the Court lacks jurisdiction.).

Just before the 1978 Code went into effect, Judge Babbit held in *Matter of DuPont Walston, Inc.,* 4 BCD 61, 16 CBC 322, CCH BLR ¶ 66,777 (Bkrtcy.S.D.N.Y.1978), that an examination of defendants in the trustee's plenary suit under the guise of Rule 2004 will not be granted where the information will become available through the process of discovery in that suit. *See, J.A.M.A. Realty Corporation Willcox v. Goèss,* 79 F.2d 546 (2d Cir.1935) (Defendant in suits initiated by trustee not entitled to Rule 2004 examination.); *In re Silverman,* 36 B.R. 254 (Bkrtcy.S.D.N.Y.1984).

In an early case interpreting Rule 205 under the Code, the Court in *In re Mantolesky,* 14 B.R. 973 (Bkrtcy.D.Mass.1981), held that a debtor was not entitled to examine former business associates on data hav-

ing no relationship to debtor's business, but was entitled to ask questions about debtor's business. *Id.,* at 977–978. In a case that is the reverse of FDIC/RTC, a bank defending itself against claims by debtors was no ground to foreclosing a creditor's 2004 examination of debtors. *In re Larkham, supra,* 24 B.R. 70 (Bkrtcy.D.Vt.1982) (Fact that examination of debtors by creditors is for purpose of securing information regarding prosecution of suits by trustee is no ground to render inquiry under 2004 objectionable.).

In a case of first impression, the Seventh Circuit in *Jefferson Trust and Savings Bank of Peoria v. Rassi (In re Rassi),* 701 F.2d 627, 10 BCD 385, 8 CBC.2d 547, CCH BLR, para. 69,092 (7th Cir.1983), reversing both the Bankruptcy and District Courts, allowed a petitioning creditor in an involuntary case the use of Rule 2004 to conduct appropriate discovery about the number of creditors for use under 11 U.S.C. § 303(b)(2).[13]

Judge Stewart in *Stonitsch v. St. Louis Banana and Tomato Company (Matter of Isis Foods),* 33 B.R. 45, 11 BCD 497, 9 CBC.2d 591 (Bkrtcy.W.D.Mo.1983), taking in our opinion a common sense approach, allowed a trustee in an adversary proceeding, in addition to ordinary discovery, expansive 2004 discovery because "to deny discovery in this adversary action only to grant it in the course of estate administration would be productive only of delay, inefficiency and injustice." *Id.,* 33 B.R. at 47.

In an oft cited case, *In re GHR Energy Corp.,* 33 B.R. 451, 10 BCD 1432, 9 CBC.2d 516 (Bkrtcy.D.Mass.1983), Judge Glennon refused a debtor's 2004 examination of creditors' expert. Judge Glennon held that a Rule 2004 examination is not intended to provide a debtor unlimited access to the internal affairs of its creditors and those employed by them. As a second holding,

---

**13.** 11 U.S.C. § 303(b)(2) provides:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

... (2) if there are fewer than 12 such holders, excluding any employee or insider of

such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims....

and citing *In re Good Hope Refineries, Inc.*, 9 B.R. 421, 423, 24 CBC 139 (Bkrtcy. D.Mass.1981), Judge Glennon questioned whether Rule 2004 was even intended to be used by a reorganizing debtor. *See, In re Valley Forge Plaza Associates*, 109 B.R. 669, 15 F.R.Serv.3d 1102 (Bkrtcy.E.D.Pa. 1990), *recon. denied, stay denied*, 1990 WL 1220, 1990 Bankr.Lexis 59 (Limited debtor's examination of creditor's expert.). *Compare, Moore v. Lang (In re Lang)*, 107 B.R. 130 (Bkrtcy.N.D.Ohio 1989) (Debtor not entitled to a protective order in adversary proceeding even though previous 2004 examination had been taken.). *But see, Matter of Georgetown of Kettering*, 17 B.R. 73, 8 BCD 934, 5 CBC.2d 1430, CCH BLR ¶ 68,583 (Bkrtcy.S.D.Ohio 1981) (Rule 2004 may not be used to obtain information about disclosure statement.). In *Matter of Wilcher*, 56 B.R. 428, 14 BCD 17, CCH BLR ¶ 70,933 (Bkrtcy.N.D.Ill.1985), Judge Morter refused to allow a 2004 examination of a purchaser of a debtor's partnership's apartment building at a Court ordered sale. Holding that in certain circumstances a bankruptcy sale purchaser may be subject to a Rule 2004 examination by a debtor, the debtor in the proceeding failed to establish cause for the requested discovery. *But see, In re Summit Corporation*, 891 F.2d 1, 19 BCD 1755 (1st Cir.1989) (Competitive bidder for Chapter 7 debtor's stock in corporation was "party in interest" entitled to discovery under Rule 2004.). *Compare, In re Apex Oil Company*, 101 B.R. 92, 19 BCD 92489093508

Finally, Judge Aug in *In re Federated Department Stores, Inc. and Allied Stores Corporation, et al.*, (Bkrtcy.S.D. Ohio 1990), (available on WESTLAW, FBKR–FDS database, Comp 1705) 1990 Bankr.Lexis 1837, held that a bank seeking discovery, under Rule 2004, of a bondholders' committee's discovery was entitled to the fruits of the examination. Judge Aug reasoned that although an adversary proceeding had not yet been filed, what was actually happening was that both sides were "arming" themselves for the eventual adversary proceeding. Moreover, because the bondholders effectively stepped into the debtor's shoes when they sought and obtained a stipulation allowing them to investigate, they should not be heard to complain when others are also trying to investigate. Besides, says Judge Aug, "(t)he Court views a thorough investigation by both sides as an aid to the expeditious litigation of ... issues when and if they arise." *Id.*

It is obvious that Rule 2004 and its predecessor have evolved over the last 90 years. This evolution, at times explosive and at other times plodding, has been as expansive as the changes it was meant to harmonize with, namely, the Chandler Act in 1938 and the 1978 Bankruptcy Code. When the focus was originally on liquidation and marshaling, the examination, although broad in scope, was limited in purpose. Much discovery by creditors was in the plenary suits outside of bankruptcy, and limited there by the State rules of discovery.

Starting with the 1978 Code there has been an expansive reading of the rule. We are sure this is partially due to the change in focus of the Code to reorganization, and the merger of Rules 205 and 11–26. The understanding generally acceptable today is that the scope of a Rule 2004 examination is very broad. Rule 2004 discovery is broader than discovery under the Federal Rules of Civil Procedure, and has fewer procedural safeguards. It can be legitimately compared to a fishing expedition. *In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bkrtcy.E.D.N.Y.1983). It can net the dolphins as well as the tuna; however, the net, in the discretion of the Court, can be carefully stitched to limit its catch. The examination of a witness about matters having no relationship or no effect on the administration of an estate is improper. *In re Johns–Manville Corp.*, 42 B.R. 362, 364 (S.D.N.Y.1984). The cases are in agreement that once an adversary proceeding is in progress a creditor/party does not have a right to a 2004 examination. They are, however, in general agreement that pending litigation by or against

the trustee is not sufficient cause to deny the examination.

■ Based upon FDIC/RTC's requested purpose, that is, claims amendment and claims litigation, we will grant its motion to receive the testimony and documents obtained in the committees' 2004 examinations, subject to specific objection. Our holding is a limited one, however, and it addresses only the relevancy and claims arguments raised by the parties because that is all that is necessary to our determination. In time, other events may require our intervention in the confidentiality issue, although for now we do not foresee the issue as one requiring our intervention because it is patently clear the parties have addressed it in their agreement.

FDIC/RTC theorizes some connection between the sought material and its filed claims. Quite frankly, we cannot see any connection, not even a tenuous connection between the taken examinations and the failed Thrifts FDIC/RTC represents. "What might have been is an abstraction, remaining a perpetual possibility only in a world of speculation." *The Burnt Norton Quartet of the Four Quartets*, T.S. Eliot. But it is not our function to speculate on the possible connection so long as there exists some relationship or effect on the administration of the estate.

■ Rule 2004 requires that we balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination. That documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production. *In re Public Service Co. of N.H.*, 91 B.R. 198 (Bkrtcy.D.N.H.1988); *Schlagenhauf v. Holder*, 379 U.S. 104, 118, 85 S.Ct. 234, 242, 13 L.Ed.2d 152 (1964). The burden of showing good cause is an affirmative one in that it is not satisfied merely by a showing that justice would not be impeded by production of the documents. *Boeing Airplane v. Coggeshall*, 108 App. D.C. 106, 280 F.2d 654, 3 F.R.Serv.2d 799 (1960). Good cause may ordinarily be sustained by a claim that the requested documents are necessary to establishment of the moving party's claim or that denial of production would cause undue hardship or injustice. *Id.*, 280 F.2d at 670. *See, Freeman v. Seligson, supra.* There is no doubt FDIC/RTC needs a large amount of discovery to buttress its claims. DBL's broad brush statements about the contents of the 2004 examinations is not enough cause to defeat FDIC/RTC's needs. The committees in this case have been free to pursue their own interests, albeit in a fiduciary mode. But there is nothing in Rule 2004 that requires the examiner to be a fiduciary. Thus, DBL's argument that FDIC/RTC is not a fiduciary is merely a smoke and mirrors argument meant to deflect and blur the real issues in this motion, namely, FDIC/RTC's right to the examination. It somehow seems impractical and unfair to prevent the potentially largest claimant from an investigation of the parameters of its claims and possible defenses. It is also no defense that FDIC/RTC might use the 2004 examination to bolster its claims. FDIC/RTC's claims may well have an effect on the administration of the estate. It is not the debtors' or committees' function to prevent discovery of a claim, but rather one of their functions as fiduciaries is to see that substantial justice is provided to all estate claimants. In any event, FDIC/RTC may be entitled to the requested discovery at a future date in claims litigation or an adversary proceeding. We believe, as Thomas Jefferson said to George Wythe, "(p)reach ... a crusade against ignorance." Private letter to George Wythe, August 13, 1786, cited in *Jefferson, the Virginian*, Dumas Malone, Little Brown & Company, 1948. The more knowledge FDIC/RTC has about its claims, the better it, DBL, and the committees will be able to resolve the claims process in this case.

FDIC/RTC is to settle an order.