In re EAGLE–PICHER INDUSTRIES, INC., et al., Debtors.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Movant,

v.

EAGLE–PICHER INDUSTRIES, INC., et al., Respondents.

OFFICIAL EQUITY SECURITY HOLDERS' COMMITTEE, Movant,

v.

EAGLE–PICHER INDUSTRIES, INC., et al., Respondents.

Bankruptcy No. 1–90–00100.

United States Bankruptcy Court, S.D. Ohio, Western Division.

June 22, 1994.

James A. Ralston, General Counsel, Eagle–Picher Industries, Inc., Cincinnati, OH, Stephen Karotkin, Weil, Gotshal & Manges, New York City, and Edmund J. Adams, Frost & Jacobs, Cincinnati, OH, for debtors Eagle–Picher Industries, Inc., et al.

Neal J. Weill, Office of U.S. Trustee, Cincinnati, OH.

Carolyn J. Buller, G. Christopher Meyer, Squire, Sanders & Dempsey, Cleveland, OH, for Unsecured Creditors' Committee.

Kevin E. Irwin, Keating, Muething & Klekamp, Cincinnati, OH, for Injury Claimants' Committee.

Claude D. Montgomery, Marcus Montgomery Wolfson & Burten P.C., New York City, and Irving Harris, Harris, Harris & Field, Cincinnati, OH, for Equity Sec. Holders' Committee.

James McMonagle, Chagrin Falls, OH, Robert Balantzow, McCarthy, Lebit, Crystal & Haiman Co., L.P.A., Cleveland, OH, for Future Claimants Representative.

William T. Hayden, Cohen, Todd, Kite & Stanford, Cincinnati, OH, for co-defendants of the debtors.

Michael A. Berman, Office of General Counsel, SEC, Washington, DC.

Daniel M. Katlein, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, for NBD Bank, N.A.

## ORDER ON MOTIONS FOR 2004 EXAMINATION

BURTON PERLMAN, Chief Judge.

Two official committees in these consolidated Chapter 11 bankruptcy cases, the Unsecured Creditors' Committee ("UCC") and the Equity Security Holders' Committee ("Equity Committee"), have moved for extensive examinations pursuant to F.R.B.P. 2004, with a comprehensive demand for production of documents by the proposed witnesses. The motions are opposed by the debtors, the Injury Claimants' Committee ("ICC"), and the Future Claims Representative ("FCR").

It is important to take note of where these bankruptcy cases are. By order of this court on June 5, 1992, a mediator was appointed whose mission was to assist the several constituencies in play in these cases toward a consensual plan of reorganization. All of the constituencies expressed agreement that such an effort might be fruitful. The order appointing the mediator conferred upon him the power to "control the procedural aspects of the mediation," including the power to "decide when to hold joint and/or separate meetings with the parties." The order also provided that:

5. No party may seek to introduce, for any purpose, evidence of a statement or of conduct during mediation at any trial or hearing that may later be held between the parties.

In addition, the order stated that the mediator could advise the court about the process, "but not about the substance of the discussions" involved in the mediation.

The subject of negotiation and mediation arose at the conclusion of a hearing which essentially pitted the debtors against the ICC and the Equity Committee. That hearing had to do with decision about a process to be followed in determining the value of asbestos claims. Evidence was introduced at the hearing. At the conclusion of that evidentiary hearing, the UCC suggested that the court, rather than deciding the issue which was the subject of the hearing, permit the parties to engage in negotiation. While the UCC was an interested observer in the subject of that hearing, it did not play a role. The participants were rather the debtors, and principally opposed to the debtors was the ICC. Upon the expression by the constituencies involved that negotiation might be fruitful, the court deferred decision on the matter which had been litigated at the hearing. The court subsequently, as we have said, with the agreement of the parties installed a mediator to facilitate the process.

It was the decision of the mediator to proceed first to explore the possibilities of reaching agreement between the parties which had been fiercely locked in litigation at the hearing, that is, the debtors, the ICC,

and the FCR. After an extended period of time, those efforts were successful. The Chapter 11 debtors at that time, November 10, 1993, issued a News Release announcing Agreement on Principal Elements of Joint Plan of Reorganization with Major Parties in Its Chapter 11 Case. That Release stated that a claims administration trust was to be created to which present and future asbestos claims would be channeled. It stated further that Eagle–Picher Industries would record an increased reserve for asbestos liabilities of $1.1 billion. The Release stated also that the debtors, ICC and FCR would negotiate with the UCC and the Equity Committee, but if a consensual plan did not emerge, a plan would be filed giving the UCC constituency a 30% distribution, with nothing for equity. The Release made no reference to any other provision of the agreement between the debtors, the ICC and FCR. (That agreement had been embodied in a document identified as the "Term Sheet.")

Upon reaching agreement among the then major adversaries, the mediator then involved the UCC and the Equity Committee in further negotiations. Those efforts thus far have not been productive.

Further background relevant to the present motion is the following. On August 28, 1992, this court entered an order upon the motion of debtors to extend the exclusivity period during which only the debtors might file a plan of reorganization. The motion was granted. The order granting the motions stated that it was:

ORDERED that pursuant to section 1121(d) of the Bankruptcy Code (i) the 120–day period specified in section 1121(b) of the Bankruptcy Code be, and it hereby is, further extended to 60 days from and after the date on which the Court receives a written statement (the "Statement") from Mr. Jerry Lawson [the court-appointed mediator] advising the Court that the mediation directed by Order of the Court dated June 5, 1992 has reached an impasse; and (ii) the 180–day period specified in section 1121(c)(3) of the Bankruptcy Code be, and it hereby is, further extended to 60 days from and after the extension specified in the immediately preceding clause (i);

\*     \*     \*     \*     \*     \*

Both movants have filed identical motions for 2004 examinations. They seek to examine ten of Eagle–Picher's top officers and outside directors as follows:

Thomas Petry, president of Eagle–Picher; David Hall, the Senior Vice–President–Finance of Eagle–Picher; James A. Ralston, the Secretary and General Counsel of Eagle–Picher; Paul Christensen, Jr., an outside director of Eagle–Picher and the former Chairman of the Board of The Cincinnati Gear Company; V. Anderson Coombe, an outside director of Eagle–Picher and the Chairman of the Board of the Wm. Powell Company; Roger Howe, an outside director of Eagle–Picher and the Chairman of the Board of U.S. Precision Lens, Inc.; Daniel LeBlond, an outside director of Eagle–Picher and the Chairman of the Board of LeBlond Makino Machine Tool Company; Powell McHenry, an outside director of Eagle–Picher and of counsel to the law firm of Dinsmore & Shohl; Charles Mechem, Jr., a former outside director of Eagle–Picher and the Commissioner of the Ladies Professional Golf Association, and Eugene Ruehlmann, an outside director and a partner of the law firm of Vorys, Sater, Seymour & Pease.

The 2004 motion seeks to compel production of the following documents by each of the ten officers and directors:

1. The minutes of meetings of the board of directors of Eagle–Picher from January 7, 1991 through the present.

2. The minutes of meetings of any committee of the board of directors of Eagle–Picher from January 7, 1991 through the present.

3. All Eagle–Picher internal documents and communications concerning the valuation of asbestos-related personal injury claims and the creation and funding of the Eagle–Picher personal injury settlement trust.

4. All documents concerning communications between Eagle–Picher and representatives of the ICC regarding the valuation of asbestos-related personal injury claims and the creation and funding of the Eagle–Picher personal injury settlement trust.

5. All documents concerning communications between Eagle–Picher and representatives of the FCR regarding the valuation of asbestos-related personal injury claims and the creation and funding of the Eagle–Picher personal injury settlement trust.

6. All documents concerning communications between Eagle–Picher and the mediator regarding the valuation of asbestos-related personal injury claims and the creation and funding of the Eagle–Picher personal injury settlement trust.

7. All documents concerning communications between Eagle–Picher and any expert or other consultant (including, without limitation, Mark Peterson and B. Thomas Florence) regarding the valuation of asbestos-related personal injury claims.

8. All documents concerning the Eagle–Picher personal injury settlement trust.

9. All documents concerning the amount of cash, debt securities, and common stock to be transferred to the Eagle–Picher personal injury settlement trust.

10. All documents concerning the basis for Eagle–Picher's determination to settle asbestos-related personal injury claims for $1.5 billion.

11. All documents concerning the Proposed Plan of Reorganization [the Agreement in Principle].

12. All documents concerning the November 10, 1993 press release issued by Eagle–Picher.

13. All documents concerning the employment agreements and severance programs referred to in Exhibit C of the Proposed Plan of Reorganization [the Agreement in Principle].

14. All documents concerning the estimation of the value of Eagle–Picher, including, without limitation, estimations of stock price, book value, going concern value, or break-up value.

15. All documents concerning the basis for Eagle–Picher's determination to pay prepetition unsecured creditors 30% of the value of their allowed claims.

16. All documents concerning the financial condition of Eagle–Picher, including, without limitation, balance sheets, profit and loss statements, cash flow statements, and earnings reports.

17. All documents concerning the capitalization of post-confirmation Eagle–Picher.

18. All documents concerning financial projections for Eagle–Picher on a post-confirmation basis.

19. Any asbestos injury proof of claim forms filed after the bar date set for such proof of claim forms.

20. All documents concerning the U.S. EPA Settlement Agreement.

Movants also propose to examine Dr. Thomas Florence, debtors' asbestos claims expert. Production of the following documents by Dr. Florence is also demanded:

1. Any and all documents created or generated since 1991 comprising or concerning any presentations you made to the Board of Directors of Eagle–Picher or to management of Eagle–Picher regarding valuation of the asbestos-related personal injury claims.

2. Any and all documents created or generated since 1991 comprising or concerning any communications you had with Eagle–Picher regarding valuation of Eagle–Picher's liability for asbestos-related personal injuries.

3. Any and all documents you received from Eagle–Picher since 1991 that you used in preparing any report done for or on behalf of Eagle–Picher.

Debtors, the ICC, and the FCR have all filed objections to the motions. Those objections came on for hearing. Essentially, it was the position of movants at the hearing that the scope of F.R.B.P. 2004 is very broad and they are entitled to conduct the demanded discovery for that reason. The objections of those opposing the motions essentially were that what was proposed was so broad in scope that it amounted to harassment. In addition, it was argued that the conducting of any discovery was premature because neither disclosure statement nor plan had yet been filed. A further argument that we regard as very consequential is that discovery sought relates to matters disclosed in the course of proceedings before the mediator, which are barred from exposure to public view by the terms of the order appointing the mediator.

The cases dealing with F.R.B.P. 2004 uniformly hold that the language of F.R.B.P. 2004 contemplates a broad scope of inquiry, but that such scope is not without its limits. *In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 711 (Bankr. S.D.N.Y.1991); *In re Fearn,* 96 B.R. 135, 138 (Bankr.S.D.Ohio 1989); *In re Texaco, Inc.,* 79 B.R. 551, 553 (Bankr.S.D.N.Y.1987). Furthermore, the one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks. *In re Hammond,* 140 B.R. 197, 201 (S.D.Ohio 1992); *In re Drexel Burnham Lambert Group, Inc., supra,* 123 B.R. at 712. Furthermore, in reaching a conclusion on what is now before us we must bear in mind that the "examination should not be so broad as to be more disruptive and costly to the debtor than beneficial to the creditor." *In re Texaco, Inc., supra,* 79 B.R. at 553.

Applying these principles, we consider first the purpose of the proposed 2004 examinations as presented by the movants. That purpose in the motions and at the argument at some times has been stated to be to seek assistance in assessing the proposal made by debtors to the movants, and at other times has been stated to be for the purpose of developing an alternate plan of reorganization. It is fair for us to conclude that some of the proposed examination is for the first purpose and some is for the other purpose. To the extent that the examination proposed is for the purpose of developing an alternate plan of reorganization, we hold that that purpose does not constitute good cause. At this time, as we have indicated above, the debtors have the exclusive right to propose a plan. They may well do so and that plan may well be confirmed, in which case there can be no justification presently for examination calculated to develop information relating to an alternate plan.

In addition, some of the proposed scope of examination extends to matters as to which knowledge was imparted in the course of the mediation process. Because of the order governing that process, we will not allow examination on such matters. After stripping away matters related to mediation or developing an alternate plan, what remains as a valid purpose for inquiry is the assessment of the proposal made by the debtors, the ICC, and the FCR to these movants. We turn now to a consideration of whether that purpose in this instance provides good cause.

The UCC in its motion says that it "has unsuccessfully sought through the mediation process" to secure information from Eagle–Picher by way of "(1) the draft of the plan or (sic) reorganization circulated among the parties; (2) financial information regarding the post-confirmation Eagle–Picher, such as capitalization and post-confirmation financial projections; and (3) information on how the $.30 on the dollar offer to unsecured creditors was determined." The status of the matter is that the several constituencies are in the posture of negotiating their respective interests. Movants know the content of the news release. We see no reason for them to be provided with drafts of the plan on which the debtors, the ICC, and the FCR may be working. A creditor has no right to see the draft of a plan before its completion. We do not recognize this demand as providing good cause for a 2004 examination.

At the hearing on the present motions, the court was informed that at the request of movants, the president of Eagle–Picher, Thomas Petry, and Dr. Florence, made presentations to those parties. Furthermore, each of movants has selected and retained experts qualified to advise them on the subjects as to which they wish to conduct the present examinations. As we have said, the only possibly valid ground which could provide good cause for the presently sought examinations is in order to assess what has been proposed to these movants. That statement, of course, assumes that this matter is still in a negotiating phase. This court holds that good cause for the examinations sought has not been shown. It is not suggested that debtors through Messrs. Petry and Florence have not placed before movants the bases for their positions, and it has not been shown that the advisors selected by movants have not armed them with adequate information to enable them to conduct meaningful negotiations. Furthermore, the discovery proposed in the present motions is extremely

broad and would clearly be disruptive and costly for debtors, while the benefit to movants in assessing the proposal is far from clear.

Accordingly, the motions by the Official Committee of Unsecured Creditors, and also the motion by the Official Equity Security Holders Committee to conduct examinations pursuant to F.R.B.P. 2004 are denied.

So Ordered.